Argued May 4; remanded June 28, 1949

# HUEBENER ET AL. *v.* CHINN
### 207 P. 2d 1136

*W. C. Perry,* of Pendleton, argued the cause for appellant. On the brief were Randall, Perry & Wells, of Pendleton.

*J. O. Turner,* of Heppner, and *John F. Kilkenny,* of Pendleton, argued the cause for respondents. With J. O. Turner on the brief were Raley, Kilkenny & Raley, of Pendleton.

Before LUSK, Chief Justice, and BRAND, ROSSMAN and BAILEY, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a decree of the Circuit Court which, after having granted the plaintiffs an accounting, awarded them judgment against the defendant for the sum of $1,049.25 and also a "judgment and decree against the defendant for the delivery by defendant to plaintiffs of the following described merchandise: * * * " At that point there follows a long list of articles, of which the following are examples: "24 soda glasses"; "1 gallon sweet relish"; "3 gallons olives"; "3 boxes Cinco cigars". The defendant-appellant is one Edward Chinn, who, prior to April 5, 1946, was the owner of a restaurant located in Heppner. On April 4, 1946, he signed a bill of sale which transferred title to the restaurant to the plaintiffs-respondents, Hans Huebener, Velma Huebener and Ray Reynolds. The Huebeners, who are husband and wife, have acquired the interest of

Mr. Reynolds and hereafter when we use the word "respondents" we will mean the Huebeners. Since April 4 the respondents have operated the restaurant. The transfer was made obedient to a contract signed by the parties February 28, 1946, which bound the appellant to transfer the restaurant to the respondents and Mr. Reynolds for the sum of $8,000.00, $2,000.00 of which was paid concurrently with the signing of the paper and the balance of $6,000.00 was rendered payable in about 45 days. Upon its payment the appellant was required to execute a bill of sale to the restaurant. Payment of the $6,000.00 was made April 4, 1946, and on that day the bill of sale was delivered.

The appellant present the following assignments of error:

1. "The Court erred in overruling the demurrer of the appellant to the amended complaint of the respondents."

2. "The Court erred in refusing the demand of the appellant for a jury trial."

3. "The Court erred in failing to sustain the appellant's demurrer to the respondents' evidence."

4. "The Court erred in granting any relief in equity to the respondents."

5. "The Court erred in including in the contract goods and merchandise of the appellant not included in the contract."

■ It will be observed that the first assignment of error is based upon a demurrer which challenged the amended complaint. The demurrer was predicated upon the ground "that the plaintiff has a plain, speedy and adequate remedy at law and the amended complaint does not state any cause of suit against the

defendant, and further that said court is without juris-
diction in equity." In support of that assignment of
error, the appellant does not argue that the complaint
fails to state a cause, either at law or in equity, but
only that the facts recited in the complaint did not
entitle the respondents to any equitable remedies. Sec-
tion 9-102, O. C. L. A., says:

"No cause shall be dismissed for having been
brought on the wrong side of the court."

Unless the complaint showed that the respondents were
entitled to no relief, either at law or in equity, the
demurrer was not sustainable: *Nelson v. Smith,* 157
Or. 292, 69 P. 2d 1072. It is clear that the demurrer
was properly overruled, and that the first assignment
of error is without merit.

We shall now consider the second and fourth assign-
ments of error. The appellant contends that if the
respondents were entitled to any relief, the law side
of the court would have afforded them adequate
remedies, and that the record shows nothing requir-
ing the attention of a court of equity. He submits
that he was entitled to a jury trial.

In the contract the appellant is designated as the
first party and the respondents, together with the
aforementioned Reynolds, as the second party. Omit-
ting formal matters, the contract reads as follows:

"WITNESSETH: That for and in considera-
tion of the faithful performance of the covenants
and agreements hereinafter contained to be kept
and be performed by the parties hereto, and the
purchase price to be paid by the parties of the
second part to the party of the first part as herein-
after stipulated, the party of the first part does
hereby sell and agree to deliver to the parties of

the second part, the following business now conducted by him at Heppner, Oregon, to-wit:

"That certain restaurant located on the west side of Main Street in the City of Heppner, Oregon, known as the Elkhorn Restaurant, together with all fixtures, linen, cash register and other property used in connection with said business, including stoves, dishes and furniture, and also including all the stock of merchandise of every kind and description therein, including the lease on said premises.

And as and for the purchase price of said property, the parties of the second part do hereby promise and agree to pay the party of the first part the sum of Eight Thousand and No 100 dollars ($8,000.00) in the manner following: the sum of $2,000.00 upon the execution of this agreement, the receipt whereof is hereby acknowledged, and the further sum of $6,000.00 on or before thirty five days from the date hereof. It is understood that the parties of the second part are procuring a G. I. loan to finance said sum of $6,000.00, and in case the procuring of such be delayed for reasons beyond the control of the parties of the second part, the party of the first part will grant an extension of ten days on said final payment.

"It is understood and agreed by and between the parties hereto, that the merchandise above referred to is to be approximately the quantity as is now in said business, but in case the said merchandise should be increased or diminished at the time the possession of said business is delivered to the parties of the second part, then the difference shall be adjusted accordingly by the parties hereto.

"It is further understood and agreed by and between the parties hereto, that the party of the first part will remain and operate said business until said final payment is made and that upon the payment thereof will deliver the possession thereof to the parties of the second part, and will make,

execute and deliver to the parties of the second part a bill of sale of said business, fixtures and merchandise transferring the same to the parties of the second part free from all incumbrances and in compliance to the bulk sale laws of the State of Oregon.''

It will be observed that (1) the subject matter of the contract was a ''business'' and the latter included fixtures and a lease; (2) no inventory or itemized list accompanied the contract; (3) the contract does not indicate how much of the purchase money represented the value of the lease and fixtures as distinguished from ''the stock of merchandise''; (4) payment of the major part ($6,000.00) of the purchase price was dependent upon the ability of the respondents to procure ''a G. I. loan''; (5) in the period afforded the respondents to procure the loan the appellant was to operate the restaurant; (6) during the appellant's operation of the restaurant he had the right to use the merchandise on hand and in the event ''the said merchandise should be increased or diminished'' by the time the balance of $6,000.00 was paid, ''the difference shall be adjusted''; and (7) upon payment of the balance of $6,000.00 the appellant was to deliver possession to the respondents and give them a bill of sale.

It is obvious that the contract of February 28 contemplated that some sort of an accounting should occur when the respondents made the final payment of $6,000.00 and assumed possession of the restaurant. We make that statement because the provisions of the contract, which imposed upon the appellant the duty to operate the restaurant from February 28 to the day he would surrender possession to the respondents, includes the following: ''In case the said merchandise should be increased or diminished at the time the

possession of said business is delivered to the parties of the second part, then the difference shall be adjusted accordingly by the parties hereto.'' The main question upon appeal is whether the Circuit Court properly held that the law side of the court was incapable of handling the accounting.

In addition to exacting of the parties the performance of the functions which normally attend sales, such as payment of the purchase money and the delivery of a bill of sale, the contract required the performance of at least two other duties, to-wit: (1) the appellant should remain in possession of the restaurant and continue to operate it as a going business until final payment was made to him; and (2) on or about the time of the final payment an adjustment of the purchase price should be made. unless the merchandise then in the restaurant was equivalent to that which was on hand February 28. It must be manifest that the provision requiring the appellant to continue to operate the restaurant until the day when final payment was made was important to the respondents. Obviously, they wished to acquire a going business and not merely the idle fixtures, stale merchandise and unused equipment of a place which had been shut down for 45 days.

It is clear that all of the goods on hand February 28 were not the object of the sale. Some of them would be consumed during the ensuing period of the appellant's operation of the place. Likewise, some of the goods which would pass into the respondents' possession were not on hand February 28. They would be purchased later by the appellant to replace items consumed in the daily operation of the business. It is impossible to determine how much of the purchase

price of $8,000.00 represented consumable goods, but it is clear from the size of the money judgment and the provision for the recovery by the respondents of a considerable list of goods that the merchandise represented a substantial part of the purchase price of $8,000.00.

The complaint, after delineating and copying into itself the contract, alleged that the appellant operated the restaurant during the period of February 28, 1946, to April 4, 1946, and that on the day last mentioned the respondents paid the balance of the purchase price, $6,000.00. Referring to the period just mentioned, the complaint averred that the appellant "while in possession of the said restaurant and the personal property above described took, sold, removed and appropriated to his own use goods, wares, merchandise, fixtures and equipment, the exact description or the value of which is unknown to the plaintiffs." It further alleged that on April 4, 1946, when the transaction was completed by the payment of the balance of the purchase price and the delivery to the respondents of a bill of sale, "no inventory was made of the stock of goods, wares and merchandise then on hand." Further averments, referring to the goods which the complaint alleges the appellant appropriated to his own use, estimate that they had a value of $3,000.00. After those averments were made, the complaint continued as follows:

"That the defendant being in possession of the said property and taking and holding the same, pursuant to the terms and provisions of the said contract, is the only person who has exact knowledge as to the property intended to be sold but depleted as aforesaid, and on account thereof should render an accounting into this court of the property on hand at the time of the execution of the contract

and at the time when the plaintiffs took possession of the premises.

"That plaintiffs have no plain, speedy, or adequate remedy at law and must resort to a court of equity where things of this sort are alone properly recognized."

The above is all that the complaint discloses concerning the need for an accounting. The prayer follows:

"1. That the defendant be required to render an account in this court as to the goods, wares, fixtures, appliances, equipment and personal property on hand at the date of the execution of the contract, and of such property which was sold between said time and the 4th day of April, 1946, and which was not replaced by the defendant, and that on such accounting the court give judgment to the plaintiffs for the amount which the court finds due to the plaintiffs under said contract.

"2. For such other and further relief as a court of equity may seem meet and proper in the premises."

It is seen from the foregoing that the complaint contains no averments of fraud and that it concedes that the contract authorized the appellant in the operation of the restaurant to consume as much of the stock of goods as his needs required.

The answer admitted the execution of the contract, the appellant's receipt of the initial payment of $2,000.00, and likewise his receipt on April 4, 1946, of the balance of the purchase money. It recited that "this defendant operated the said business until April 4, 1946, as his own for his sole benefit" and alleged: "If the plaintiffs have any remedy, they have a plain, speedy and adequate remedy at law and this case should be transferred to the law side of this court for a full determination of the claims of the plaintiffs,

and this defendant demands a trial by jury of this cause.''

In stating their contentions, the brief filed by the respondents proceeds as follows:

"The complaint shows that the respondents acquired an interest in the property being sold. The legal title to the property was retained by the appellant while the equitable title was in the respondents. During the time the appellant was in possession of the property in which the respondents had an interest, he sold a considerable portion thereof and refused to account to the respondents for the merchandise sold. There can be little question but that the appellant was a trustee for the purpose of delivering to the respondents substantially the same amount of property which was on hand at the date of the sale. He violated his trust and failed to do this."

Thus it is seen that the respondents contend that the appellant was a trustee in the period of February 28 to April 4. They say:

"Courts of equity have jurisdiction to settle accounts whenever a fiduciary relation exists between the parties, and the duty to render an account to one of the parties rests on the other, and a person is said to act or receive money or contract a debt in a 'fiduciary capacity' where the business which he transacts or the money or property which he handles is not his own, or for his own benefit."

It is apparent that the respondents predicate their right to maintain this suit for an accounting upon the postulates that the contract which the parties signed on February 28 transferred to the respondents "the equitable title" to the restaurant, and that from that day until April 4 the appellant held the legal title as trustee. The appellant denies that the respondents

acquired any interest in the restaurant February 28 when the contract was signed, and likewise denies that any fiduciary relationship existed between the parties in the period of February 28 to April 4. According to him, the respondents' rights are purely contractual and have no equitable attributes.

Although the complaint, in language which we have quoted, alleged that the appellant, in the period of February 28 to April 4, appropriated to his own use "fixtures and equipment," in addition to consumable goods, no effort was made at the trial to prove that the appellant removed any fixtures or equipment.

■ The question that is at stake in this case is the right to trial by jury in cases based upon purported violation of contractual duties. The issue is by no means unimportant. Constitution of Oregon, Art. I, § 17, says:

"In all civil cases, the right of trial by jury shall remain inviolate."

No citation to the authorities is needed to warrant the statement that the constitutional provision just quoted, and similar ones in the constitutions of our sister states, do not render jury trial available in equity proceedings. Therefore, it is our duty to determine whether the pleadings presented a cause of equitable cognizance.

We shall now determine whether or not the contract of February 28 transferred to the respondents an interest in the property and whether or not it created a fiduciary relationship between the parties.

The respondents' brief says:

"In the contract the appellant agreed to sell to the respondents not only certain goods, wares and

merchandise, but also certain fixtures and all other property used in connection with the business, including the lease on the premises. Therefore, by the contract of sale, the appellant agreed to sell not only personal property but also an interest in real property. The purchase price of $8,000.00, was for the entire business, including the personal and real property. The contract is indivisible * * *."

The Uniform Sales Act, §§ 71-101 to and including 71-180, O. C. L. A., is applicable only to the sale of "goods" which § 71-176 defines as "all chattels personal other than things in action and money." It is, therefore, clear that since the contract of February 28 included in non-segregated form both real and personal property, it is not governed by the Uniform Sales Act.

By reverting to the agreement of February 28, which is quoted in a preceding paragraph, it will be noticed that it employs the phrase "the party of the first part does hereby sell". The latter word is used in its present tense. The contract, however, provides that the appellant should continue in possession of the restaurant and should continue to operate it until he delivered a bill of sale to the respondents. The time for the delivery of the bill of sale was postponed until the respondents paid the appellant the balance ($6,000.00) of the purchase money. The conclusions of law entered by the Circuit Court state:

"In view of the language employed in the written agreement (Plaintiff's Exhibit B) 'the party of the first part' (the defendant) 'does hereby sell and agree to deliver to the parties of the second part' (the plaintiffs) 'the following business . . .,' the sale was made by defendant to plaintiffs on the date of the agreement, February 28th, 1946."

That conclusion was obviously influenced by the tense of the verb "sell". From Williston on Sales, Rev. Ed., § 262, we quote:

> "Not too great stress must be laid upon the use of the words 'sale' or 'buy', or 'sold' or 'bought' by the parties. These words are constantly used as meaning or including contract to sell or contract to buy."

The strength of that statement is fortified by a review in a footnote which accompanies the text of several pertinent decisions.

In *Fennikoh v. Gunn,* 59 App. Div. 132, 69 N. Y. S. 12, the plaintiff, as owner of a grocery store, signed an agreement which read as follows:

> "This agreement, entered into this 8th day of May, 1900, between H. Fennikoh * * * party of the first part, and Louis Mohneke and Henry Mohneke * * * parties of the second part: For and in consideration of the sum of one dollar the party of the first part sells unto the parties of the second part, upon conditions hereafter named, all the rights, title, and interest of grocery store at No. 116 Berry Street, Brooklyn."

The parties of the second part (purchasers) were given immediate possession of the store. The conditions which the agreement exacted of them were: to devote their time to the store; to secure the first party's (vendor's) approval to future purchases of goods; to discharge in monthly installments of $50 the purchase price of $2,200.00; to pay the first party weekly for any purchases made in his name; and to give the first party the benefit of the wholesale price for any goods he purchased in the store. The agreement bound the second parties to maintain the stock of merchandise.

Its final provision follows: "The party of the first part agrees to give to parties of the second part a free and clear bill of sale when total amount of two thousand two hundred dollars ($2,200) is paid in full." The court held:

> " * ❊ * I think that the intention of the parties contemplated only a conditional sale until the payment of the purchase price. The provision in the agreement that when that price is paid in full a bill of sale will be given is inconsistent with the claim that the title was to pass when the agreement was made. Boon v. Moss, 70 N. Y. 465, 473. And the use of the term 'sell' does not necessarily import an executed contract. * * * "

It will be seen that in that case, unlike, as in the present one, the buyers were given immediate possession. In that case the same terms of the verb "sell" was employed as in the contract of sale before us.

We are satisfied that the presence in the agreement of the word "sell" does not in itself indicate that the respondents acquired on February 28 an interest in the properties which constituted the subject matter of the agreement.

■ From Williston on Contracts, Rev. Ed., § 264, we take the following:

> "However this may be, the law is now well settled in accordance with the rule of the Sales Act, both where that Act is in force and under the common law that the property is presumed to pass when the contract is made if the goods are identified, and nothing remains to be done other than delivery of the goods and payment of the price. A word of warning is necessary, however, in regard to cash sales, so-called, where the property does not pass until payment of the price unless the condition is waived."

From 46 Am. Jur., Sales, § 412, p. 584, we quote:

"In the case of an executory contract of sale, the title does not pass, ordinarily, until the consummation of the transaction by performance of the terms and conditions of the contract to sell. Stated affirmatively, the title passes to the buyer when the contract becomes executed, in the absence of an intention to the contrary. The contract is said to be executory when there remains something to be done the performance of which is a condition precedent to the transfer of the property, and executed when the thing and price have been assented to and nothing remains to be done to complete the transaction."

*Hubler v. Gaston and Furry*, 9 Or. 66, was concerned with the question as to the time when title passes. In that case, the defendant sold to the plaintiff 2,000 bushels of oats which he agreed to deliver to the plaintiff in sacks on board cars at Albany. The decision said:

"Two questions are presented by this record. First, do the facts, as admitted by the pleadings, show an executory or an executed contract? And, second, * * * ? A contract is said to be executory when there remains something to be done, the performance of which is a condition precedent to the transfer of the property, and executed when the thing and price have been assented to, and nothing remains to be done to prevent the transfer of the property.

\* \* \*

"In Wilkinson v. Holiday, 33 Mich. 386, this doctrine of the law is accurately stated by Chief Justice Cooley, who says: 'Where, under a contract for the purchase of personal property, something remains to be done to identify the property, or to put it in a condition for delivery, or to determine the sum that shall be paid for it, the presumption is always very strong that by the understanding

of the parties the title was not to pass until such act had been fully done and accomplished.' "

The court held that since the selection and identification of the oats remained to be made, the contract was executory and title had not passed.

■ We think that in the instant case the contract was executory. Six things remained to be done before title passed to the respondents: (1) The respondents were required to pay the balance of the purchase price; (2) the appellant was to continue to operate the restaurant as a going business; (3) the appellant was to continue to consume, day by day, merchandise then on hand; (4) an inventory of the merchandise on hand when the final payment was discharged would have to be made or in some other way the goods to be transferred would have to be ascertained before a bill of sale could be drafted and the contemplated adjustment in the purchase price could be made; (5) the appellant was to deliver to the respondents a bill of sale; and (6) an adjustment in the purchase price was to be made in such an amount as would represent the difference in the goods on hand February 28 and the day of final payment. Thus, we see that the contract of February 28, upon which the respondents rely to prove that in the period of February 28 to April 4 they had an interest in the property, was purely executory. It transferred no interest.

Before disposing of the assignments of error now under consideration, we shall go on and consider another principal of law.

■ We quote the following from Restatement of the Laws, Trusts, § 13.

"A contract to convey property is not a trust, whether or not the contract is specifically enforceable.

"Comment: .

> "a. Nature of interests of beneficiary and purchaser. If a contract to convey property is not specifically enforceable, the purchaser acquires no interest in the property before the conveyance is made, but has merely a personal claim against the vendor.
>
> "If the contract is specifically enforceable, the purchaser acquires an equitable interest in the property, but the relation between the vendor and purchaser is not a trust. The relation between the vendor and purchaser, unlike that between trustee and beneficiary, is not a fiduciary one; it is more nearly analogous to a mortgage."

The statement just quoted indisputably reflects the attitude of the courts: Bogert, Trusts and Trustees, § 18, and Scott on Trusts, § 13.

The well-reasoned opinion entitled *Bowman v. Adams,* 45 Ida. 217, 261 P. 679, decided many of the important issues which are before us. In that case, the facts were that on September 6, 1922, when the plaintiff owned 13,002 sheep, he and the defendants entered into an agreement which was manifested by two contracts known to the record as Exhibits A and B. By Exhibit A the plaintiff agreed to sell and deliver to the defendants on or before September 25, 1922, 5,500 ewes for the sum of 5¢ per pound, payable $2,500 cash and the balance on delivery of the sheep. By Exhibit B the defendants agreed to sell and deliver to the plaintiff on or before February 15, 1923, the same ewes, but at 7¢ per pound, payable $2.00 per head upon execution of the agreement and the balance upon delivery of the ewes. Exhibit B provided that the defendants should deliver the ewes "strictly fat" to the plaintiff on or about February 15, 1923, at Twin Falls.

By mutual agreement the number of sheep covered by the contracts was increased to 13,002. Obviously, the purpose of the agreements was the fattening of the sheep. The defendants lacked the necessary funds and, with the plaintiff's knowledge, arranged a loan from a lender entitled Western Bond & Mortgage Company. In order to secure the lender, the defendants transferred to it their title in the sheep and signed chattel mortgages.

When the defendants received the money from the Western Bond & Mortgage Company they paid to the plaintiff the purchase money exacted by Exhibit A less $2.00 per head. The $2.00 per head was withheld because Exhibit B required the plaintiff to pay $2.00 per head upon execution of that writing. Thus a part of the repurchase money was paid concurrently with the delivery of the sheep to the defendants.

After the 90-day period had passed the defendants selected 3,200 of the sheep in the yards at Twin Falls and notified the plaintiff that they were in a deliverable condition. The plaintiff, however, upon examination of the sheep, claimed that they were not "strictly fat" and a controversy developed. At that juncture the defendants shipped to market 2,200 of the sheep and delivered the remainder to the Western Bond & Mortgage Company, which sold them.

The plaintiff's complaint alleged breach of contract for the nondelivery of the sheep and prayed for damages. Similar relief was asked against the Western Bond & Mortgage Company upon a contention that that concern had converted the sheep to its own use. The

plaintiff made the same claim against the Western Bond & Mortgage Company which the respondents in this case make against the appellant. For instance, according to the decision:

> "As to the mortgage company, the principal question is as to the propriety of an instruction whereby the jury were informed that the title of Adams and Beech (the defendants) was a qualified title, burdened with a trust in favor of the plaintiff, and that if the mortgage company obtained bills of sale or mortgages with knowledge of the contractual relations of the parties, under Exhibits A and B, it took them subject to plaintiff's contractual rights and his title and trust estate, and was liable to plaintiff for losses sustained by him in its taking possession of the sheep and selling them. In support of this instruction, plaintiff, as respondent here, contends that under the circumstances of the case, he had a 'sort of trust estate or equitable interest' in the sheep, or some sort of an equitable lien upon them, which the mortgage company was bound to respect."

It will be seen that more could have been said in the Idaho case than can be said in this one in favor of a holding that (1) a fiduciary relationship existed, (2) the underlying contract created a trust, and (3) an equitable title was transferred to the plaintiff. The plaintiff in that case had a contract which entitled him to the return of the sheep when the defendants had fattened them. The sale to the defendants was a temporary one. The plaintiff had paid upon the re-purchase price $2.00 per head. When the contractual relationship was effected, the plaintiff was the owner of the sheep. Agreements A and B interlocked, and although they were written upon two sheets of paper, they were, in fact, one agreement.

528

In holding erroneous the instruction to which reference was made in the quoted language, and in reversing the judgment for the plaintiff, the court said:

"The only theory upon which respondent cites any authorities in support of his contention is the rule applied in cases of executory contracts of sale of real estate that a vendor of real estate holds the title in trust for the vendee. Perry on Trusts (6th Ed.) § 231. This rule is not in general applied to sales of personal property, but is merely a right recognized under contracts of sale of real estate by reason of the peculiar nature of real property whereby equity has come to recognize a right to the specific performance of such contract. Where a contract is susceptible of specific performance in equity, the vendee has an equitable interest in the property to be conveyed, and it is considered that the vendor's title is burdened with a trust in favor of the vendee. The same doctrine is applicable in sales of personal property where goods are of a peculiar nature and value to the vendee of the property, so that pecuniary damages at law are inadequate. In such cases, it is considered that the purchaser, having a right to the very thing itself, has an equitable interest in it. But in the sale of ordinary chattels, which have a market value, the legal remedy of damages is adequate, and there is no necessity for equitable interference, and for such specific performance. Pomeroy on Specific Performance (3d Ed.) § 47; Brady v. Yost, 6 Idaho, 273, 55 P. 542. In such case, where no lien is expressly granted to the vendee by the contract, the vendee has no equitable interest in the thing itself."

After Professor Bogert, in § 18 of his splendid treatise on Trusts and Trustees, has taken notice of the fact that some courts have employed in the instance of "a specifically enforceable executory con-

tract of sale'' the word ''trust'', which he says is a ''loose, inaccurate use,'' he adds:

> ''Naturally this broad employment of the word 'trust' is not extended to contracts of sale not specifically enforceable, as in the case of ordinary chattels. The buyer there has generally no equitable rights and cannot be said to resemble a cestui, to say nothing of being a cestui.''

To support that statement, he cites *Bowman v. Adams,* supra, the decision which we just reviewed.

It would be unreasonable to believe that the parties in this case intended that the respondents should acquire title to the property February 28. There was no certainty at that time that the purchasers would be able to secure the needed $6,000.00 and it is obvious that for that reason the provision was inserted in the contract that no bill of sale was to be delivered until the final payment was made.

We conclude that title to the goods mentioned in the contract did not pass to the respondents February 28. In fact, the respondents themselves do not think that the legal title to the property was affected by the contract. They argue, however, that the contract segregated the legal title from the equitable title and transferred the latter to them, the respondents. We know of no basis for this contention and believe that neither the equitable nor the legal title passed to the purchasers February 28. Even if some kind of an equity had passed to the respondents, that fact would not have made the appellant a fiduciary. The respondents evidently had confidence in the financial responsibility of the appellant and depended upon the latter's integrity for a fulfillment of the contract, in the event they secured the needed $6,000.00. The truth of the matter

is that the evidence shows that when the contract of February 28 was signed, other purchasers were in the market for the restaurant; and it is reasonable to infer that the respondents signed the instrument in order to secure a contractual right to the property.

Without resort to further analysis, we express our belief that the contract of February 28 created no fiduciary relationship. Accordingly, this case does not present an instance in which a fiduciary was required to make an accounting.

Notwithstanding the conclusion just expressed, we will not conclude our consideration of this case at this point. We have taken notice of the fact that the agreement contemplated that concurrently with the making of the final payment an accounting or an adjustment was to be made, in the event that the goods then on hand were not the equivalent of those in the place on February 28.

A court of equity may assume jurisdiction of a case in which an accounting is sought even though the defendant is not a fiduciary, provided it satisfactorily appears that the account is so complex that justice can not be done without resort to the superior equipment of an equity court. See, generally, 1 Am. Jur., Accounts and Accounting, § 53, p. 301. When a pleading avers a fiduciary relationship and the prayer seeks an accounting, the averments concerning the fiduciary relationship may suffice to confer jurisdiction upon the equity court. Under those conditions, the pleader may be safe in omitting allegations that the account is complicated. When the defendant is not a fiduciary and the cause is not of the type over which equity has jurisdiction, and yet an accounting is sought, the averments concerning the complexity of the account must

be so specific that the chancellor can see from them that he, and not a jury, should try the issues. In such an instance, it is the complexity of the account upon which reliance is placed to confer jurisdiction upon the chancellor. Before considering the authorities, let us revert for a moment to the complaint. It contains no allegation, at least none which is direct, that the account between the parties was complicated. It says:

> "The defendant, being in possession of the said property and taking and holding the same, * * * is the only person who has exact knowledge as to the property intended to be sold but depleted as aforesaid, and on account thereof should render an accounting."

That language warrants an inference that the respondents sought an accounting, not because of any complexity in the account, but because the facts were unknown to them. In other words, they wished a discovery although the prayer which is quoted in a preceding paragraph sought none.

The decisions which mention the complexity in accounts which is needed to deny a party trial by jury and confer jurisdiction upon a chancellor use such terms as "great complications", and "difficulties in the way of adequate remedy at law." Pomeroy's Equity Jurisprudence, 5th Ed., § 1421, bestows some attention upon the meaning of those phrases. However, in the solution of our problem, we will derive our greatest help, not from definitions, but from the precedents.

*Williams v. Herring,* 183 Iowa 127, 165 N. W. 342, L. R. A. 1918f 798, was begun as an action at law for breach of contract. Under the terms of the latter (1) the defendant agreed to establish an oil and gasoline

business as a department of his business; (2) the plaintiff agreed to devote his entire time to this department; (3) the defendant agreed to pay the plaintiff a monthly salary of $125 and 30% of the net profits; and (4) the defendant agreed to permit the plaintiff to purchase an interest in the business. The plaintiff alleged that the defendant breached the contract by failing to pay him his share of the profits and by denying him permission to purchase an interest in the business. The defendant's answer admitted the contract and averred that the inspection of the large number of items of accounts and the books of account would be necessary. It moved that the cause be transferred to equity. The motion was denied by an order which became the principal subject of attack on appeal. In affirming the order, the court pointed out:

"The principal contention of counsel for appellant, however, is that the ascertainment of the net income, if any, of said business necessarily involves the examination and consideration of all of the items of income received and expense incurred in the conduct of said business, that numerous other questions, such as depreciation in the value of buildings and equipment, taxes, losses, etc. must be considered, and that the number of items involved is so great that same can be properly tried and determined only by a court of chancery."

It held:

"It does not appear from the pleadings that there are mutual accounts to be considered, but rather that all of the accounts are upon one side, and that the trial of the first account of plaintiff's petition involves only the determination of the question whether said business yielded a net income. Undoubtedly the number of items upon the books and the transactions covered by the period of said business will be cumbersome and difficult to present

to a jury, and yet, so far as the pleadings disclose, the accounts are not complicated or intricate, but vast in point of numbers. It is a matter of common experience that in the trial of cases of this character items of account in any dispute are practically eliminated by agreement of counsel, and that accounts involving great numbers of items and vast sums of money are presented in such a way as to reasonably be within the understanding and comprehension of a jury. * * * The fact that the controversy involves a large number of items of debit and credit arising out of many business transactions, and that the same could be more conveniently tried to the court is not a ground of equitable jurisdiction. The test is not whether the cause can be more conveniently or satisfactorily tried and determined by the court than a jury, but the accounts must be mutual requiring an accounting or there must be some other ground of equitable cognizance not shown to exist in this case."

From *Goffee & Clarkener, Inc., v. Lyons Milling Co.*, 26 F. 2d 801, we quote the following:

"This brings us to the pivotal question: May equity decree an accounting, where there is but a single account, which is long and complicated and confusing? It is entirely clear that mere difficulty of proof does not confer jurisdiction upon equity. In suits upon promissory notes, the notes may be ever so many, the payments trivial and frequent, the computation ever so difficult, but the remedy is exclusively at law. Suits upon fire insurance policies, especially covering stocks of merchandise, often involve examination of inventories, and records of purchases and sales covering indefinite periods; the action is still at law to recover the amount of the damage. The Supreme Court has said:

" 'The principal ground upon which it is claimed that the remedy at law is inadequate is really

nothing more than a difficulty in proving the case against the defendants. The bill shows that whatever was done in the way of cutting the timber and carrying it away was done by the defendants as tort-feasors, and the various devices alleged to have been resorted to by the deceased, Daly, by way of organizing different corporations, in order to, as alleged, cover up his tracks and to render it more difficult for the complainant to make proof of his action, does not in the least tend to give a court of equity jurisdiction on that account.'"

*City of Sedalia v. Standard Oil Co.*, 66 F. 2d 757, 95 A. L. R. 1514, was a suit to collect from the oil company a tax imposed by an ordinance which required oil companies which sold or transported gasoline to pay a license tax of one-half cent per gallon. The court said:

"This suit was brought as a suit in equity for an accounting. There is no allegation of mutual accounts or of any other subject of equitable cognizance, but it was the theory of the bill that an accounting is authorized because it will be necessary to consider many transactions between the defendant and its customers, and to examine the books and records of carriers who transported gasoline to the defendant, and of those who sold the gasoline to defendant, as well as of those to whom defendants sold gasoline during the period in question, and because the defendant did not report all gasoline sold under the terms of the ordinance. We agree with the trial court that these facts present no ground for maintenance of a suit in equity for an accounting:

Certiorari was denied by the United States Supreme Court: 54 S. Ct. 374, 290 U. S. 706, 78 L. Ed. 607.

*Reilly v. Woolbert*, 196 Ala. 191, 72 So. 10, was based upon a contract under which the plaintiff became

superintendent of the defendant's coal mine, was promised a salary graduated according to the volume of the mined coal and was given a right to purchase an interest in the mine. The decision said:

> "But there is also an alternative prayer for an accounting between the parties as creditor and debtor merely, in case no partnership is shown; and this rests on the allegation that respondent's indebtedness to complainant 'is by a complicated account, consisting of numerous items of debits and credits each month for over five years.' This allegation is not sufficient to show either a complicated or a mutual account, so as to necessitate or permit the exercise of an independent chancery jurisdiction in the premises. Chrichton v. Hayles, 176 Ala. 223, 57 South. 696; Phalin v. Dearman, 181 Ala. 320, 61 South. 941. It is not sufficient, because numerous items are not necessarily complicated, and because debits and credits do not alone constitute a mutual account. The demurrer to this aspect of the bill was well taken, and should have been sustained."

*McCraw, Perkins & Webber Co. v. Yates,* 175 Ark. 220, 298 S. W. 1001, was a case in which the plaintiff was engaged in business as a cotton factor. The defendant shipped cotton to the plaintiff and drew various drafts on the plaintiff which were accepted and paid by the plaintiff as advances on the account. After the complaint had made those averments, it continued as follows:

> " ' * * * The account consists of various mutual items of debt and credit, involved the sale of numerous bales of cotton, and that the balance due thereon, as of date July 20, 1923, is the sum of $1,271.65, an itemized account showing said drafts and bales of cotton shipped, and charges by way of freight, storage, insurance, and interest is attached to this complaint marked Exhibit A and

made a part thereof. Said account is complicated and intricate, and proof supporting the details of said account will be voluminous, intricate, and too complicated other than in a court of equity. In addition, a quasi fiduciary relation existed between the plaintiff as cotton factor and defendant as customer, and plaintiff is for that reason entitled to an accounting in equity. * * * ' "

The court held:

"The account exhibited is itemized, containing items of credit and debit, and showing a balance due of $1,271.65. It is not very long, and we see nothing in it which can be characterized as intricate or complicated."

From *United States Shipping Board Merchant Fleet Corporation v. United States Fidelity & Guaranty Co.*, 77 F. 2d 370, we quote:

" * * * It is also true that, as to the third ground, equity has jurisdiction to settle mutual accounts between the parties. But the jurisdiction does not exist because the accounts are difficult or complicated. There must be such complexity as makes it clearly appear that the case presents a problem too difficult for a jury to unravel. The right to trial by jury may not be taken away if there is a practical and efficient remedy at law. * * * "

We know of no authorities at variance with the foregoing and will, therefore, discontinue our review of them. It is manifest that a suitor, who depends upon complexity to confer jurisdiction upon a court of equity, must allege and prove facts which show, not only a lengthy account, but one which is so difficult and complicated that it is beyond the ken of jury trial.

The pleadings, as we have already pointed out, do not disclose any complexity in the account, we have

examined carefully the evidence, but the examination failed to show any need for resort to equity. It did not indicate that the account was complex or difficult. In fact, the trial was hardly concerned with an accounting. The trial consisted of making two inventories. One of the latter contained a list of all goods on hand February 28 and the other was a list as of April 4. As the witnesses mentioned the articles, such as the number of cases of canned peas, etc., the articles were jotted down and in that way the inventories were prepared. The fact that the list as of February 28 was found to be larger than the other was, of course, favorable to the respondents. It developed that the appellant had a large quantity of cigarettes, canned goods, etc., in his living quarters. The respondents were awarded a recovery of them, principally under the provision of the contract which spoke of "any other items of property used in connection with said business."

The only difficulty which developed during the trial was in determining the quantities of goods to be entered in the two inventories. That difficulty, however, was not with the account, but with matters which preceded it; that is, the two inventories. It arose from the fact that no one possessed complete lists showing the goods in the restaurant February 28 and April 4. The respondents overcame the trouble as fully as was possible by use of the following methods: (1) they had procured a search to be made of the appellant's living quarters by the local sheriff in advance of the trial, and as a result of it received an inventory of everything he possessed useful in a restaurant; (2) they examined the appellant under oath prior to the trial under the provisions of § 4-303. O. C. L. A.; and (3)

they called the appellant to the witness stand as an adverse witness and examined him extensively as to the merchandise. The respondents had other evidence in addition to that just mentioned, but it was of the kind commonly employed in breach of contract cases. Thus it is seen that not only was the account not complicated, but also that the trial moved along in the same manner in which it would have progressed before a jury. It is clear that the account was not sufficiently difficult to justify resort to equity.

But the complaint alleged that the appellant was "the only person who has exact knowledge as to the property", etc. From those words it might be inferred that a discovery was sought; however, the prayer asked for none. As we have seen, the respondents availed themselves of the provisions of § 4-303, O. C. L. A., and examined the appellant under oath prior to the trial. That procedure is a form of discovery that may be used in either actions at law or in suits in equity. The respondents did not resort to the other form of discovery rendered available in all proceedings by § 10-401, O. C. L. A. Those two provisions have lessened the need for resort to equity as the means of eliciting from one's adversary facts over which he has control: *State ex rel. v. American Surety Co.*, 148 Or. 1, 35 P. 2d 487; *State v. Security Savings Co.*, 28 Or. 410, 43 P. 162; and 27 C. J. S., Discovery, § 7, p. 14. The complaint contains no averment that the means provided by §§ 4-303 and 10-401 for eliciting from the appellant the knowledge which he possessed were not sufficient. We now turn to *French v. Strange Mining Co.* 133 Va. 602, 114 S. E. 125, in which the plaintiff sought a recovery for the value of a large quantity of manganese ore which he claimed was taken from a

tract of land that he owned. According to his complaint, one of the defendants performed the mining, another received the ore and the third converted it into cash. The complaint averred the need for a disclosure. The decision commented upon the fact that the complaint stated an action of trespass which belonged on the law side of the court unless the need for discovery took it from the law side and transferred it to the equity side. We now quote:

"To accomplish such a transfer of jurisdiction, a complainant must allege facts showing that he could not recover at all without the discovery.

\* \* \*

"But where the complainant asks a court of equity for both discovery and relief, and his demand is proper for the law court, and he seeks to transfer it to a court of chancery, he must show that only by discovery can he recover. He must allege that the facts concerning which a disclosure are sought are material, and that he has no means of proving those facts by the testimony of witnesses, or by any other kind of evidence used in courts of law; that the only mode of establishing them is by compelling the defendant to make disclosure, and therefore that a discovery by suit in equity is indispensable.

\* \* \*

" ' In order to sustain such a bill, he must comply with strict and rigid requirements. He must show that the evidence he seeks to obtain by his discovery is not only relevant, material and beneficial, but also absolutely indispensable to his defense and impossible of acquisition in any other way. \* \* \* The reason for this distinction is that in the case of a bill of discovery only, the object is merely to obtain evidence for use in the trial of the action at law, while in a bill for both discovery and relief, the purpose is much broader; the object

being to elicit evidence and also to transfer the case from the legal to the equitable forum.' "

We are satisfied the complaint was insufficient to warrant the relief of a discovery.

In our opinion, the pleadings were insufficient to confer jurisdiction upon a court of equity and to authorize a denial to the appellant of a trial by a jury. We also think that the evidence afforded no basis for any equitable relief.

The decree of the Circuit Court is set aside. The cause is remanded to the Circuit Court for trial as an action at law.

BRAND, J., concurs in the result.