Argued and submitted May 26, affirmed June 22, 2005

Alexander HUDJOHN,
*Appellant,*

*v.*

S&G MACHINERY CO.,
an Oregon corporation,
and Deere & Company,
a foreign corporation,
*Respondents.*

01-02-40656; A121002

114 P3d 1141

Dwain M. Clifford argued the cause for appellant. With him on the briefs were James T. McDermott and Ball Janik LLP.

Bruce H. Orr argued the cause for respondent S&G Machinery Co. With him on the briefs were James E. Bartels and Meyer & Wyse LLP.

R. Daniel Lindahl argued the cause for respondent Deere & Company. With him on the brief were Stephen F. English, Peter J. Viteznick, and Bullivant Houser Bailey PC.

Before Haselton, Presiding Judge, and Ortega, Judge, and Deits, Judge pro tempore.

HASELTON, P. J.

## HASELTON, P. J.

Plaintiff appeals from a judgment for defendants in this personal injury action, raising several assignments of error. Defendants counter with a battery of cross-assignments of error, including a contention that the trial court erred in denying defendants' motion for a directed verdict based on the legal insufficiency of plaintiff's proof of medical causation. As explained below, we agree with defendants that the trial court so erred. *See Chouinard v. Health Ventures*, 179 Or App 507, 512, 39 P3d 951 (2002). Accordingly, we affirm.

In reviewing the denial of a motion for directed verdict, we view the evidence, including reasonable attendant inferences, in the light most favorable to the nonmoving party, here, plaintiff. *Mauri v. Smith*, 324 Or 476, 479, 929 P2d 307 (1996); *Joshi v. Providence Health System*, 198 Or App 534, 536, 108 P3d 1195 (2005). To place the directed verdict motion in procedural context, we recount the background of this litigation and then, consistently with the standard of review, describe plaintiff's evidence pertaining to causation of injury.

In the summer of 2000, plaintiff was working for defendant S&G Machinery Co. (S&G) in La Grande. S&G is an authorized dealer of defendant Deere & Company (Deere). On or about July 26, 2000, plaintiff's supervisor told plaintiff to puncture and drain approximately 50 spent aerosol cans that had contained Deere products, including paints, cleaning agents, and lubricants. The supervisor directed plaintiff to puncture the cans, using a so-called "apparatus," draining the liquid into a bucket.

At least some of the products in the aerosol cans contained hazardous chemicals. For example, the label on Deere paint cans bore the following warning:

> "VAPOR HARMFUL. MAY AFFECT THE BRAIN OR NERVOUS SYSTEM CAUSING DIZZINESS, HEADACHE OR NAUSEA. CAUSES EYE, SKIN, NOSE AND THROAT IRRITATION. To avoid breathing vapors or spray mist, open windows and doors or use other means to ensure fresh air entry during application and drying. If you

experience eye watering, headaches or dizziness, increase fresh air or wear respiratory protection * * * or leave the area. Avoid contact with skin and eyes. Do not take internally.

"**NOTICE:** Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal.

"KEEP OUT OF REACH OF CHILDREN. USE WITH ADEQUATE VENTILATION.

"**FIRST AID:** If you experience difficulty in breathing, leave the area to obtain fresh air. If continued difficulty is experienced, get medical assistance immediately. In case of eye contact, flush immediately with plenty of water for at least 15 minutes and get medical attention; for skin, wash thoroughly with soap and water. If swallowed, get medical attention immediately.

"**WARNING!** This product contains chemicals known to the State of California to cause cancer and birth defects or other reproductive harm."

The label also included a warning: "Do not puncture or incinerate (burn) container."[1] Nevertheless, plaintiff's supervisor gave plaintiff no warnings and did not provide plaintiff with a respirator or protective clothing.

Plaintiff punctured and drained the cans for between 30 and 45 minutes, working roughly five feet away from a large, partially opened shop door. Immediately afterward, plaintiff told a coworker that he felt "lightheaded." In

---

[1] The labeling for Deere "Brake & Parts Cleaner" included a similar warning:

"**WARNING:** Use with adequate ventilation. Avoid prolonged breathing of vapor or contact with eyes and skin. In case of eye contact, flush immediately with water for at least 15 minutes. If discomfort persists, see a physician. Inhalation may cause dizziness, drowsiness and throat irritation. Eye and skin irritant. If ingested, do not induce vomiting, contact physician. Do not puncture or incinerate container. * * *. This product contains a chemical known to the State of California to cause cancer."

The labeling for Deere's "All Purpose Cleaner" included similar warnings by including a warning that "overexposure" to the product could cause "harmful effects to liver," and concluded with the statement, "DELIBERATE MISUSE BY CONCENTRATING VAPORS AND INHALING CONTENTS CAN BE HARMFUL OR FATAL."

the days and weeks that followed—and, for the most part, continuing at the time of trial—plaintiff experienced extreme fatigue, nausea, weight loss, trembling in his extremities, forgetfulness, and mental "confusion." When plaintiff's parents saw him for the first time after July 26, approximately a week later, they were extremely concerned about his appearance and behavior. According to plaintiff's father, plaintiff "was not the same person I knew."

Plaintiff subsequently filed a workers' compensation claim against S&G for a "neurological injury to his brain" from alleged workplace exposure to toxic vapors on or about July 26, 2000. S&G denied that claim in November 2000. On January 4, 2002, an evidentiary hearing on that claim was held before an administrative law judge (ALJ). Plaintiff, as claimant, and S&G offered medical evidence on the questions of whether plaintiff had suffered a brain or neurological injury and whether the July 2000 episode, as described by plaintiff, could have caused such an injury. On April 22, 2002, the ALJ issued an opinion and order, determining that plaintiff had failed to prove the compensability of his claim:

"It is disputed whether there are objective findings to support the medical evidence of an injury. Dr. Morton presumed that there was an exposure and an injury from the fact that claimant reported that claimant's symptoms were improving and claimant's performance on some neuropsychological tests seemed to improve over time. Other examiners doubt the validity of claimant's reports based on claimant's performance on the neuropsychological tests. Dr. Wong-Ngan and Dr. Weller suspect there may be some deficits but they cannot quantify them. The only constant in the reports is claimant's report of his symptoms which remain unverified by medical examinations. The record is very weak to establish that claimant has or had an objectively verified injury to his brain or neurological functions from any source or cause let alone from the alleged exposure to chemicals in late July 2000. *Considering the record as a whole, including the testimony, I am not persuaded that claimant has established by medical evidence supported by objective findings that he has a brain or neurological injury or disease.* However, since the standard for establishing objective evidence of an injury is very low, I have considered

the evidence of causation as if the record did establish a neurological injury.

"* * * * *

"* * * Claimant's evidence does not prove more than a possibility that he was exposed to something at work and that that exposure may have contributed something to the symptoms he reports but which are not verified by objective medical evidence. *Considering the insufficiency of the evidence to establish that whatever exposure claimant may have suffered at work is even a material contributing cause of his reported symptoms, claimant is not entitled to an award of compensation on this record.*"

(Emphasis added.) Plaintiff did not appeal the ALJ's order to the Workers' Compensation Board.

Meanwhile, in October 2000, plaintiff had filed this civil action, alleging, *inter alia*, claims for "deliberate" personal injury against S&G and for negligence against Deere. Extensive motions practice ensued, much of which pertained to S&G's invocation of immunity from civil liability by virtue of the "workers' compensation exclusivity" statute, ORS 656.018(1)(a).[2] Ultimately, plaintiff filed the operative first amended complaint, alleging claims for negligence against both S&G and Deere. In that complaint, plaintiff sought to recover damages for the following alleged injuries:

"In the days immediately following his exposure to multiple hazardous and toxic chemicals and substances, and as a direct result of that exposure, [plaintiff] experienced numerous detrimental physical symptoms, including, but not limited to: severe trembling in his hands and body; lethargy; nausea; loss of short-term and long-term memory; excessive thirst; difficulty speaking and reasoning; and

___

[2] ORS 656.018(1)(a) provides:

"The liability of every employer who satisfies the duty required by ORS 656.017(1) is exclusive and in place of all other liability arising out of injuries, diseases, symptom complexes or similar conditions arising out of or in the course of employment that are sustained by subject workers, the workers' beneficiaries and anyone otherwise entitled to recover damages from the employer on account of such conditions or claims resulting therefrom, specifically including claims for contribution or indemnity asserted by third persons from whom damages are sought on account of such conditions, except as specifically provided otherwise in this chapter."

sleeplessness. [Plaintiff] also lacked the physical strength that he used to have. Those symptoms continue to this day.

"* * * [plaintiff] has incurred permanent and serious physical injuries, including, but not limited to, a major brain injury or trauma. As a result of that injury, [plaintiff] suffers from, and will continue to suffer from, indefinitely, the symptoms discussed above, including, but not limited to: short-term and long-term loss of memory and physical shaking. In addition, [plaintiff] suffers from, and will continue to suffer indefinitely from, a loss of cognitive reasoning ability."

In December 2002, S&G moved for summary judgment on three alternative grounds. *First*, the exception to workers' compensation exclusivity embodied in the "*Smothers*-fix" statute, ORS 656.019(1)(a), did not apply to plaintiff's negligence claims against S&G because the ALJ had rejected plaintiff's workers' compensation claim on grounds other than plaintiff's "fail[ure] to establish that a work-related incident was the major contributing cause of the worker's injury."[3] Specifically, the ALJ had determined that plaintiff had failed to prove that (a) he had suffered any neurological or brain injury; and (b) any workplace exposure was a *material* cause, much less a major cause, of any injury. *Second*, ORS 656.019(1)(a) was further inapposite because the ALJ's order was not "final" within the meaning of that statute—that is, the statute applied only in circumstances in which the Workers' Compensation Board had determined the noncompensability of a claim. *Third*, under principles of either issue preclusion or claim preclusion, the ALJ's determination that plaintiff had failed to prove injury in fact and material causation barred relitigation of a claim for a brain or

---

[3] ORS 656.019(1)(a) provides:

"An injured worker may pursue a civil negligence action for a work-related injury that has been determined to be not compensable because the worker has failed to establish that a work-related incident was the major contributing cause of the worker's injury only after an order determining that the claim is not compensable has become final. The injured worker may appeal the compensability of the claim as provided in ORS 656.298, but may not pursue a civil negligence claim against the employer until the order affirming the denial has become final."

The legislature enacted that statute in 2001, *see* Or Laws 2001, ch 865, § 15, in response to the Supreme Court's holding in *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001).

neurological injury resulting from exposure to hazardous substances in late July 2000. Deere joined in S&G's motion for summary judgment on grounds of issue preclusion.

The trial court denied the summary judgment motions, concluding that (1) the ALJ's rejection of plaintiff's workers' compensation claim was, in fact, based on a failure of proof of major causation; (2) the ALJ's order was "final" for purposes of ORS 656.019(1)(a); and (3) material issues of fact precluded the entry of summary judgment on issue preclusion or claim preclusion grounds.

The case was tried to a jury in January 2003. Plaintiff testified about his actions and his injuries, describing the facts recounted above. *See* 200 Or App at 342-44. Plaintiff's parents and a long-time friend testified regarding their "before-and-after" observations. Plaintiff presented testimony from a single expert, Robert Butler, Ph.D., a board-certified neuropsychologist and associate professor at Oregon Health and Science University. Butler described the neuropsychological evaluation of plaintiff that he had performed, including administering "tests of mental abilities, intelligence, attention, memory, language, [and] problem solving," and then stated his conclusions:

"Q: [By plaintiff's counsel]  Okay, would you tell the jury what your opinions are regarding [plaintiff] to a reasonable psychological probability?

"A:  Based on the results of my evaluation I do think he is exhibiting neuropsychological deficits. There is evidence of cognitive impairment. I believe that to the extent to which, um, the toxins he was exposed to are detrimental to the brain, that that insult, that episode of inhalation of toxins may be accounting for some degree of this impairment. I also believe that psychological issues and factors are contributing to his current level of impairment too.

"Q:  And when you say psychological factors are contributing to [plaintiff's] current uh psychological deficit, what do you mean?

"A:  Depression, anxiety, being upset. Feeling helpless. Um, assuming the role of a patient.

"* * * * *

"Q:   Based on the—the tests you conducted and the assessments that you performed uh do you have an opinion to a reasonable psychological probability as to whether Mr. Hudjohn is suffering from a neuropsychological abnormality?

"A:   Yes.

"Q:   What is that opinion?

"A:   If we define or consider an abnormality the same thing as impairment, or a deficit, or a problem, or not performing in a range that we would expect given his age, yes, he is exhibiting neuropsychological abnormalities."

On cross-examination by Deere's counsel, Butler gave the following responses:

"Q:   What area would you say you would defer to someone else on in terms of your opinion?

"A:   That's a very broad question.

"Q:   In the area of toxicology would you defer to someone else?

"A:   Most definitely.

"* * * * *

"Q:   Okay. Um, again, Doctor, going back to your comments, um, earlier in our discussion earlier about being further away from the injury and getting better, I want to read from you or read for you what you wrote again in your summary. Quote, one would not expect continued decline in neurocognitive functioning this distance from exposure to potential toxins, close quote.

"A:   Correct.

"Q:   What did you mean by that?

"A:   Well this gets back to your previous question where I had to answer it yes or no. I do have some knowledge of acute exposure to toxic substances such as lead and I have evaluated patients that have had brief exposures to solvents and I am somewhat familiar with the literature. *I am not a toxicologist and I in no way, shape or form [am] competent to come close to knowing what all those things do to the central nervous system, hence my statement if these things are toxic to central nervous system.* Um, but from my

knowledge acute exposure such as Mr. Hudjohn had for acute meaning was of short, reasonably short duration. It didn't go on for days and days and days[,] *it was just one time incident and what I know about brain function in those types of exposures, if you were going to see impairment I would expect it to be reasonably mild and I would not expect it to progress.*"

(Emphasis added.)

At the close of plaintiff's evidence, both defendants moved for a directed verdict based on the insufficiency of plaintiff's proof of causation and, particularly, based on plaintiff's failure to present expert testimony that there was a "reasonable medical probability" that plaintiff's alleged injuries, including his alleged permanent neurological and cognitive impairments, were caused by on-the-job exposure to toxic substances. The trial court denied the motion, concluding that the combination of three factors—(1) the content of the label warnings on the aerosol cans, including references to various symptoms and potential neurological damage, (2) the temporal relationship between plaintiff's puncturing of the cans and the onset of symptoms, and (3) Butler's testimony—was sufficient to permit a reasonable trier of fact to find the requisite probability of causation of injury.[4]

Defendants also moved for directed verdicts on other grounds, and the court granted Deere's motion for a directed verdict based on the insufficiency of evidence of negligence as to Deere. The trial then continued with respect to S&G. During its case-in-chief, S&G presented expert testimony by Dr. Brent Burton, a physician, who is board-certified in occupational medicine and medical toxicology. Burton rendered an opinion "to a reasonable medical probability" that plaintiff

---

[4] The court, after referring to the product labeling that said, "[m]ay affect the brain or nervous system causing dizziness, headache or nausea," concluded:

"So let me make a ruling that maybe has already been commented upon by higher courts, but it seems the intrinsic nature of these labels produces the following. The manufacturer is telling the user this is bad stuff. It's harmful to your body. I'm not sure if that is an actual admission or not, but in the Court's mind it certainly goes to—to a causality issue as has been raised by [S&G's counsel]. So I am not going to ignore the information on the warning labels regarding the effects these chemicals can have on the nervous system."

had not suffered any neurological injury or any other physical impairment as a result of the alleged exposure—and that, specifically, the timing and nature of the symptoms that plaintiff reported were inconsistent with the sort of exposure that he described. Burton rendered an opinion that, given the lack of physical/toxicological causation, plaintiff was probably "malingering."[5]

At the close of all evidence, S&G renewed its motion for a directed verdict based on the insufficiency of plaintiff's proof of causation, and the court denied that motion. Ultimately, the jury returned a verdict for S&G.[6]

On appeal, plaintiff raises three assignments of error, challenging the trial court's allowance of Deere's directed verdict motion, the court's exclusion of occupational safety citations issued to S&G, and the court's rejection of plaintiff's proposed jury instructions on negligence *per se*, with reference to arguably applicable occupational safety regulations. Deere cross-assigns error to the trial court's

---

[5] Burton testified as follows:

"And at the time that he was actually puncturing the cans uh he described virtually no symptoms uh which is inconsistent with the kind of symptoms that one is going to get from exposure to those substances if the exposure is meaningful. Um, and the reason I say that is these substances are irritating to the eyes, noses, throat and lungs so in a closed space a high enough concentration of these substances, which in general are called solvents 'cuz they get in the air and—and such, um, uh irritation is—is inescapable. Eyes, nose, throat, lungs so some tearing, blurring, burning nose, burning throat, inhale cough, perhaps some chest pain or shortness of breath. Uh, he didn't have that so that makes it pretty unlikely uh that he had any meaningful exposure at the time. Also, he did not have symptoms of intoxication. Um, solvents uh cause intoxication that is identical to alcohol. Um, persons who become intoxicated with solvents, um, develop staggering, slurred speech, all of those things, very impaired thinking, uh it'd be very difficult to drive home for example. Um, but that didn't happen either. Instead we have a rather bizarre and inconsistent history of—of memory lapses that span days, weeks or periods of time during which time he's also exhibiting normal behavior, um, by everybody, ever[y]body's account uh including his own. Um, so that doesn't make sense. What that does tell me is that the stories I'm getting since it doesn't make sense and can't be explained by a medical condition must be explained by a diagnosis of malingering."

[6] The jury gave a negative answer to the compound special interrogatory: "Was the defendant negligent in one or more of the ways alleged in the plaintiff's complaint and, if so, was such negligence a cause of damage to the plaintiff?" That verdict was rendered before the Supreme Court's decision in *Lyons v. Walsh & Sons Trucking Co., Ltd.*, 337 Or 319, 96 P3d 1215 (2004), which addressed the practical implications under *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 61 P3d 928 (2003), of such a compound interrogatory. *See Lyons,* 337 Or at 325-26.

denial of summary judgment based on issue preclusion arising from the workers' compensation ALJ's order and to the court's denial of a directed verdict based on the alleged insufficiency of plaintiff's proof of causation of injury. Finally, S&G also cross-assigns error to the same rulings and to several others, including the court's denial of its motion for summary judgment and, later, a directed verdict based on the operation of workers' compensation exclusivity under ORS 656.018(1)(a).

We agree with defendants that plaintiff's proof of causation of injury was legally insufficient. Accordingly, we affirm on that alternative basis. That disposition obviates any consideration of the assignments of error and the other cross-assignments of error.

■■■ .The gravamen of plaintiff's claims was that he had suffered continuing and permanent physical, neurological, and cognitive impairment as a result of a single exposure to toxic fumes. Thus, as we address further below, the issue of causation in this case involved a complex medical question. As we most recently reiterated in *Baughman v. Pina*, 200 Or App 15, 18, 113 P3d 459 (2005),

> "When the element of causation involves a complex medical question, as a matter of law, no rational juror can find that a plaintiff has established causation unless [the plaintiff] has presented expert testimony that there is a reasonable medical probability that the alleged negligence caused the plaintiff's injuries."

*See also Uris v. Compensation Department*, 247 Or 420, 424, 427 P2d 753 (1967) ("[W]here injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, the question is one of science and must necessarily be determined by testimony of skilled professional persons." (Internal quotation marks omitted.)); *Chouinard*, 179 Or App at 512-13 (affirming directed verdict where the plaintiff had failed to adduce expert testimony that there was a reasonable medical probability that the plaintiff's undiagnosed brain tumor caused plaintiff's vertigo, nausea, and headaches). The requirement of such testimony, we explained in *Baughman*, is designed to prevent "jurors from speculating about causation in

cases where that determination requires expertise beyond the knowledge and experience of an ordinary lay person." *Baughman*, 200 Or App at 18; *see also Howerton v. Pfaff*, 246 Or 341, 347-48, 425 P2d 533 (1967).

■   Here, Butler's testimony did not satisfy that standard. Again, Butler's pertinent testimony on direct examination was as follows:

> "Based on the results of my evaluation I do think he is exhibiting neuropsychological deficits. There is evidence of cognitive impairment. I believe that *to the extent to which, um, the toxins he was exposed to are detrimental to the brain*, that that insult, that episode of inhalation of toxins **may be** accounting for **some degree** of this impairment. I also believe that psychological issues and factors are contributing to his current level of impairment too."

(Italics and boldface added.) That testimony, if credited, was sufficient to establish that plaintiff did, in fact, have "neuropsychological deficits" and "cognitive impairment." But, as we noted in *Chouinard*, " 'there is a wide difference between determining whether an injury actually exists and its cause.' " 179 Or App at 513 (quoting *Howerton*, 246 Or at 347). Butler's testimony was legally insufficient to establish the latter.

Butler's testimony was fatally deficient in at least two respects. First, it was premised on an unquantified and unsubstantiated predicate: "to the extent to which * * * the toxins he was exposed to are detrimental to the brain * * *." Butler offered no expert opinion regarding the toxic qualities of the substances in the aerosol cans, much less the probable neurological consequences of exposure in the circumstances that plaintiff reported. Indeed, on cross-examination, Butler freely acknowledged that he was "not a toxicologist"; that he "in no way, shape or form [was] competent to come close to knowing what all those things do the central nervous system"; and that he would "most definitely" defer to an expert in the area of toxicology. 200 Or App at 348.

Second, Butler's opinion as to causation, even as so qualified, was explicitly stated in terms of possibility ("may be") and not probability. Although, as we emphasized in *Baughman*, "magic words" are not required, the expert's

opinion, read as a whole, must establish a probability of causation. *Baughman*, 200 Or App at 18; *Joshi*, 198 Or App at 545. Here, Butler's testimony is not reasonably susceptible to such a construction.

■       Plaintiff contends, however—and the trial court concurred—that any gaps and deficiencies in Butler's testimony regarding causation could be bridged by reference to the warnings on the aerosol cans' labels and to the temporal proximity between plaintiff's reported exposure and the onset of his alleged symptoms. There is, to be sure, a certain intuitive appeal to that approach—after all, plaintiff presented evidence that he almost immediately experienced some of the symptoms mentioned in the product labeling, *viz.*, nausea and dizziness. That intuitive appeal is redoubled by the ostensible common wisdom that exposure to toxic fumes is not good for one's brain.

Nevertheless, with respect, it is precisely that sort of intuitive resort to lay logic that the requirements of competent expert opinion on causation in complex medical cases is imposed to forestall. *See Baughman*, 200 Or App at 18; *accord Chouinard*, 179 Or App at 513 ("Although plaintiff argues that tumors and their effects on the body are a matter of common knowledge, we agree with the trial court that the issue of causation was a complex medical question that required expert testimony."). Consequently, exceptions to that rule of proof appear to have been limited to cases of simple injuries, generally without a substantial possibility of alternative causation. *Compare Wheeler v. LaViolette*, 129 Or App 57, 877 P2d 665 (1994) (no expert medical testimony regarding causation of knee injury was required where the plaintiff stepped into space left by a missing plank in a dock and promptly sought medical attention for knee pain, and where contemporaneous emergency room report noted a "superficial abrasion" just above the knee), *with Myers v. Dunscombe*, 64 Or App 722, 669 P2d 388, *rev den*, 296 Or 236 (1983) (affirming directed verdict where the plaintiff offered no expert opinion that negligently administered dental injection had caused her nerve damage and there was at least one alternative explanation for causation of the plaintiff's injury).

Here, plaintiff's alleged injuries, involving neurological and cognitive impairment, were hardly simple. Nor were the dynamics of toxicological causation so straightforward as a leg plunging through a hole in a dock. Indeed, the only expert medical opinion in this case was that the sort of toxic exposure that plaintiff reported could not have caused the physical and neurological injuries that he claimed. *See* 200 Or App at 350 n 5 (describing Burton's testimony).

We note finally that, even assuming without deciding that the warnings on product labeling could, in some cases, ameliorate deficiencies in expert testimony on causation, this is not such a case. That is so not only because of the complexity of plaintiff's claimed injuries and of the dynamics of causation, but also because the relationship between the content of Deere's warning labels and the nature of plaintiff's claimed injuries was indefinite and variable. For example, while the paint can labeling warned that "[r]eports have associated *repeated and prolonged occupational overexposure* to solvents with permanent brain and nervous system damage" (emphasis added), none of the labels stated that continuing and permanent neurological damage of the sort that plaintiff claims could result from a single exposure.[7] Further, although plaintiff reported experiencing lightheadedness and nausea, which corresponded to the product warnings, he did not experience the eye and skin irritation that all of the labels uniformly identified as a symptomatic indication of toxic exposure. Nor did any of the labels indicate that nausea and dizziness would continue for weeks, or even years, as plaintiff alleges.

In sum, the relationship between the label warnings and plaintiff's reported injuries was far from clear-cut. Thus, even if, in the abstract, evidence of product warnings could provide the "missing link" of proof of medical/scientific causation, the requisite correspondence was not present here.

Plaintiff failed to proffer legally sufficient evidence that the alleged workplace exposure caused his alleged

---

[7] Rather, the labeling indicates that such exposure could affect the brain and nervous system "CAUSING DIZZINESS, HEADACHE OR NAUSEA." 200 Or App at 342.

injuries. Defendants' motion for a directed verdict on that ground should have been granted.

Affirmed.