Argued and submitted September 6, 2011, on Cell Tech's appeal, dismissed for lack of a justiciable controversy; on Kollman's cross-appeal, affirmed; on Carpenter's appeal, affirmed; on Special Litigation Committee's cross-appeal, affirmed May 31, 2012

Daryl KOLLMAN,
on his own behalf,
*Plaintiff-Respondent,*

*and*

SPECIAL LITIGATION COMMITTEE,
on behalf of the shareholders of
Cell Tech International, Inc.,
a Delaware corporation,
*Plaintiff-Respondent,*

*v.*

CELL TECH INTERNATIONAL, INC.,
A CORPORATION OF DELAWARE,
a Delaware corporation;
Donald P. Hateley,
individually and as director of
Cell Tech International Incorporated,
a corporation of Delaware;
Deann Hampton;
Hateley & Hampton, LLC,
a California professional corporation;
John Does 1-10;
Stoel Rives, LLP,
an Oregon limited liability partnership;
Gersham Goldstein; Eileen Drake;
John Neubauer; and Justin Straus,
*Defendants,*

*and*

Marta CARPENTER,
fka Marta Kollman,
individually and as officer and director of
Cell Tech International Incorporated,
a corporation of Delaware,
*Defendant-Appellant.*

Daryl KOLLMAN,
on his own behalf,
*Plaintiff-Respondent*
*Cross-Appellant, Cross-Respondent,*

*and*

SPECIAL LITIGATION COMMITTEE,
on behalf of the shareholders of
Cell Tech International, Inc.,
a Delaware corporation,
*Plaintiff-Cross-Respondent,*
*Cross-Appellant,*

*v.*

CELL TECH INTERNATIONAL, INC.,
A CORPORATION OF DELAWARE,
a Delaware corporation,
*Defendant-Appellant*
*Cross-Respondent,*

*and*

Deann HAMPTON;
Hateley & Hampton, LLC,
a California professional corporation;
John Does 1-10;
Stoel Rives, LLP,
an Oregon limited liability partnership;
Gersham Goldstein; Eileen Drake;
John Neubauer and Justin Straus,
*Defendants,*

*and*

Donald P. HATELEY,
individually and as director of
Cell Tech International Incorporated,
a corporation of Delaware,
*Defendant-Respondent,*

*and*

Marta CARPENTER,
fka Marta Kollman,
individually and as officer and director of
Cell Tech International Incorporated,
a corporation of Delaware,
*Defendant-Respondent*
*Cross-Respondent.*

Klamath County Circuit Court
0203774CV; A126612

279 P3d 324

Jeffrey M. Batchelor argued the cause for appellant-respondent/cross-respondent Marta Carpenter. With him on the brief were David W. Melville and Markowitz, Herbold, Glade & Mehlhaf, P.C.

Keith A. Pitt argued the cause for appellant-cross-respondent Cell Tech and cross-respondent/cross-appellant Special Litigation Committee. With him on the brief were Starla J. Goff and Smith Freed & Eberhard, PC.

George W. Kelly argued the cause and filed the briefs for respondent/cross-appellant Daryl J. Kollman.

No appearance for respondent Donald P. Hateley.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Brewer, Judge.

BREWER, J.

## BREWER, J.

Plaintiff Kollman, a shareholder of Cell Tech International, Inc., (Cell Tech) initiated this action against his former wife, Carpenter, the chief executive officer and president of Cell Tech, and Carpenter's lawyer, Hateley, the chair of Cell Tech's board of directors, alleging, as pertinent here, that they breached their fiduciary duties to him. As explained in more detail below, Kollman alleged both direct and derivative claims against Carpenter and Hateley. In accordance with a jury verdict, the court ultimately entered a limited judgment on a direct claim for breach of fiduciary duty against Carpenter and Hateley in the amount of $40 million. Kollman alleged various other claims against Carpenter and Hateley, as well as claims against defendant Cell Tech, but he did not prevail on any of those claims. Carpenter appeals, arguing that the trial court erred in various respects and seeks reversal of the judgment. Kollman cross-appeals, asserting that the trial court erred in ruling in favor of defendants Carpenter and Cell Tech concerning certain breach of contract claims; we reject Kollman's cross-appeal without discussion.[1]

Cell Tech also appeals, despite the fact that it prevailed as a defendant in the trial court, arguing that Kollman did not adequately represent Cell Tech's shareholders on the derivative claims. Cell Tech asserts that the trial court erred in entering judgment for Kollman on the direct claim; instead, Cell Tech suggests that the court should have entered judgment in favor of Cell Tech (on behalf of its shareholders) on one of Kollman's derivative claims against Carpenter and Hateley for breach of fiduciary duty. Cell Tech's position is problematic because it was not a plaintiff but, rather, was a defendant in the trial court. We conclude that no justiciable controversy exists between Cell Tech—as defendant-appellant—and Carpenter and Hateley, who are the only parties against whom Cell Tech appears to claim to be adverse. "Parties cannot create adversity by declaration when there is none in reality." *Bocci v. Key Pharmaceuticals,*

---

[1] Initially, Hateley also appealed. Subsequently, Hateley dismissed his appeal, and Kollman dismissed his cross-appeal against Hateley, pursuant to a settlement agreement. The order dismissing Hateley is described in more detail below.

*Inc.*, 158 Or App 521, 577, 974 P2d 758 (1999), *vac'd*, 332 Or 39, 22 P3d 758 (2001) (Landau, J., dissenting). In this case, the point is one of principle, not semantics, because before, during, and even after trial, Cell Tech in truth acted as a defendant.

On appeal, Cell Tech seeks to assume the position of a *de facto* plaintiff, because it would be beneficial to its shareholders to have a judgment against Carpenter and Hateley on derivative claims brought by Kollman.[2] Although we do not have a case directly on point, the underlying principles that lead to the conclusion that Cell Tech's current "claim" is not justiciable are clear: The pleadings in this case govern the scope of any relief that may be obtained. Cell Tech may not, by making an argument in the first instance on appeal, obtain relief against another defendant without having pleaded and proved an entitlement to do so in the trial court. The problem, in effect, is one of "adversity," which is one of the requirements of justiciability. *See, e.g., Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993) (describing various aspects of justiciability). A defendant who was not adverse to other defendants in the trial court is not in a position to assert, for the first time on appeal, what amounts to a cross-claim against those other defendants. Because we conclude that no justiciable controversy exists between Cell Tech and the parties against whom it purports to assert a right to recovery, we dismiss Cell Tech's appeal.[3]

Anticipating the problem with justiciability, Cell Tech has taken a fallback position. After the entry of judgment for Kollman on the direct claim, Kollman ceased to be a shareholder of Cell Tech. Thereafter, Cell Tech filed a "Motion for Substitution of Counsel as to Derivative Claims,"

---

[2] Kollman asserts that Cell Tech lacks standing to take the position it does on appeal. This may not be, strictly speaking, a problem of "standing," which generally refers to whether a party is in a position to bring a claim. " 'Standing' is a legal term that identifies whether a party to a legal proceeding possesses a status or qualification necessary for the assertion, enforcement, or adjudication of legal rights or duties." *Kellas v. Dept. of Corrections*, 341 Or 471, 476-77, 145 P3d 139 (2006). However, as explained below, the problem is one of justiciability.

[3] Kollman also notes that, because Cell Tech's position in the trial court was entirely different from its position on appeal, it failed to adequately preserve any of the claims it now makes. We need not address that problem, in light of our conclusion that the appeal must be dismissed due to lack of justiciability.

asserting that, because Kollman was no longer a share-holder, counsel for Cell Tech should be substituted for counsel for Kollman on the derivative claim for breach of fiduciary duty. The Appellate Commissioner of this court denied that motion, stating:

> "First, if Daryl Kollman is no longer a shareholder of Cell Tech and no other shareholder is prepared to be substituted in his place, then the appeal should be dismissed as to Daryl Kollman in his capacity as a shareholder proceeding on behalf of the shareholders of Cell Tech. Second, if Daryl Kollman on behalf of the shareholders of Cell Tech is dismissed as a party to this appeal, then he no longer needs to be represented by counsel in that capacity. Third, * * * insofar as it appears from the title of this case, Daryl Kollman and Cell Tech are adverse parties, therefore it would be inappropriate for both Daryl Kollman in any capacity and Cell Tech to be represented by the same attorney.

> "* * * The court on its own motion dismisses Daryl Kollman on behalf of the shareholders of Cell Tech as a party to this appeal."

In light of the commissioner's order, Cell Tech created a "Special Litigation Committee,"[4] and the Committee filed a motion for "substitution/intervention of Special Litigation Committee" for Kollman in order to "pursue the appellate rights of Cell Tech with regard to the derivative claims/judgments, as set forth in Cell Tech's Opening Brief." Kollman did not oppose the substitution of the Special Litigation Committee for him with respect to the derivative claim, and thus the commissioner granted the motion as follows:

> "The court's [previous order] dismissed Daryl Kollman, in his capacity as a shareholder on behalf of the shareholders of Cell Tech, as a respondent to Carpenter's appeal and as to Cell Tech's appeal. The Special Litigation Committee now has been substituted in Kollman's place as to the derivative claims and is the real party in interest with respect to those claims. Therefore, the Special Litigation Committee on behalf of the shareholders of Cell Tech is restored as a

---

[4] Cell Tech notes that, under Delaware law (which the parties agree applies to the breach of fiduciary duty claims in this case), a corporation may create "a special litigation committee to restore control over derivative litigation" in some circumstances. *In re Oracle Corp. Derivative Litigation*, 808 A2d 1206, (Del Ch 2002).

respondent as to both of those appeals. Further, because Kollman's notice of cross-appeal may have been filed on his behalf in an individual capacity and in his capacity as representative shareholder of Cell Tech as to the derivative claims, the Special Litigation Committee also is reinstated as a cross-appellant."

Several years before the entry of that order (the appeal in this case was initiated in 2004), Kollman and Hateley moved to dismiss this appeal with respect to Hateley. We granted that motion as follows:

"Pursuant to a settlement agreement, Hateley has agreed to dismiss his appeal and Kollman has agreed to dismiss his cross-appeal as to Hateley. Cell Tech has interposed a contingent objection to the motion for the purpose of clarifying that Kollman's dismissal of Hateley as a cross-respondent not prejudice Cell Tech's appeal in which Cell Tech has identified Hateley as a respondent. This court determines that Kollman's dismissal of his appeal as to Hateley does not remove Hateley as a respondent to Cell Tech's appeal."

In light of the above-described orders, we summarize: Cell Tech's presence here, by way of its Special Litigation Committee, is as a party that has been substituted for Kollman on Kollman's derivative claims. Thus, to the extent that the Special Litigation Committee has any viable position here, it is on cross-appeal with respect to the derivative claims, and it is only with respect to Carpenter.[5]

Thus, and despite the lengthy captioning of this case, for purposes of the issues addressed herein, the *dramatis personae* are appellant Carpenter (defendant below), who asserts that no judgment should have been entered against her, and respondent Kollman (plaintiff below), who

---

[5] In Cell Tech's opening brief on appeal, which has been adopted by the Special Litigation Committee, Cell Tech asserts that, should it prevail on its argument concerning the derivative claim, a judgment against defendant Hateley on one of the derivative claims should be entered "so that Cell Tech may pursue whatever post-trial collection avenues exist, if any, available against Hateley." However, the Special Litigation Committee was substituted for Kollman on cross-appeal on the derivative claim after Kollman's settlement with Hateley, and, as noted in the above-quoted order, Hateley has been dismissed as a respondent to the cross-appeal. Thus, the Special Litigation Committee is not in a position to assert that a judgment should be entered against Hateley; it essentially stepped into Kollman's shoes on cross-appeal, and it did so after Kollman had already settled with Hateley.

disagrees. The Special Litigation Committee is a cross-appellant (substituted on the derivative claims for plaintiff/cross-appellant Kollman), and Carpenter is adverse to the Special Litigation Committee on cross-appeal, because it asserts that judgment should have been entered against her in favor of Cell Tech's shareholders on one of Kollman's derivative claims.[6] With the parties' respective roles thus clarified and simplified, we survey the issues before us.

On appeal, Carpenter raises a litany of arguments, most of which we reject without discussion. As an initial matter, we note that one of Carpenter's assignments of error is that the trial court erred in denying her motion to try the subject breach of fiduciary duty claim to the court in equity, rather than submitting it to the jury. Based on that premise, Carpenter recites the facts in her brief "in accordance with the *de novo* standard of review," citing ORS 19.415(3) (2007). For two reasons, we do not apply that standard here. First, even if Carpenter were correct that the trial court should have tried the breach of fiduciary duty claim in equity, that would not alter *our* standard of review of the facts. Rather, in such a circumstance, the proper remedy would be a remand for a bench trial. Second, and more fundamentally, Carpenter challenges the trial court's denial of her motion for a directed verdict. On review of the denial of a motion for a directed verdict, we view the evidence, including any inferences, in the light most favorable to the nonmoving party. *Hudjohn v. S & G Machinery Co.*, 200 Or App 340, 342, 114 P3d 1141 (2005). It follows that a recitation of the facts from a *"de novo"* perspective would be of no use where the claim at issue was tried to a jury, and the issues on appeal are (1) whether, instead, the claim should have been tried to the court; and (2) whether there was sufficient evidence to withstand a directed verdict.

With that foundation in mind, we address Carpenter's assertion that the trial court should have tried the direct breach of fiduciary duty claim in equity rather than submitting it to the jury. Carpenter relies on decisions in which

---

[6] With respect to Kollman's cross-appeal, Kollman is adverse to Carpenter (defendant below) and Cell Tech (defendant below), but as noted, we affirm on that cross-appeal without further discussion.

claims involving a breach of fiduciary duty were tried in equity to the court. Kollman responds by citing cases in which claims involving breaches of fiduciary duty were tried in an action at law. However, those cases are not particularly helpful, because they do not explain *why* a particular case was tried in equity or at law. The answer, however, is clear from other case law:

> "To determine whether a claim is legal or equitable, the court looks to the pleadings. *See Thompson v. Coughlin*, 329 Or 630, 637-38, 997 P2d 191 (2000) (test for determining whether jurisdiction is in law or equity generally turns on the nature of the relief sought in the pleadings); *Huebener v. Chinn*, 186 Or 508, 519, 207 P2d 1136 (1949) (in deciding whether Article I, section 17, jury trial right applies, court must 'determine whether the pleadings presen[t] a cause of equitable [or legal] cognizance'). The label that a party places on a claim is not necessarily dispositive. *See Thompson*, 329 Or at 638 (so holding). For example, the plaintiff in *Thompson* sought an accounting to resolve a dispute among partners, which is ordinarily an equitable claim that would not entitle a party to a jury trial. However, in determining whether the plaintiff's claim should have been tried to a jury, this court explained that it had long recognized that, when 'adequate relief may be obtained in law, * * * equitable jurisdiction will not be invoked.' *Id.*"

*McDowell Welding & Pipefitting, Inc. v. U.S. Gypsum Co.*, 345 Or 272, 279-80, 193 P3d 9 (2008) (brackets in original). The nature of the relief sought generally determines whether a claim is based on law or equity. *See generally Assn. of Unit Owners v. Far West Federal Bank*, 120 Or App 125, 134, 852 P2d 218 (1993). In general, a claim for monetary damages inheres at law. *See, e.g., Wakeman v. Paulson*, 264 Or 524, 529-30, 506 P2d 685 (1973) (claim against corporate directors seeking payment of wages owed by dissolved corporation was an action at law: "The prayer asks only for a money judgment against defendants with no request for equitable relief of any kind."). With respect to the only claim on which Kollman prevailed against Carpenter, Kollman alleged that Carpenter had caused him to suffer "economic damages in an amount of $55,000,000.00," and he sought to recover that amount. In light of the nature of the relief sought, the trial court correctly tried that claim at law rather than in equity.

Carpenter's remaining arguments concern the trial court's denial of her motion for a directed verdict on the direct breach of fiduciary duty claim. Only two of those arguments require discussion. First, Carpenter asserts that Kollman's claims were exclusively derivative and, accordingly, the court erred in denying her motion for a directed verdict on the direct claim. Second, she argues that Kollman's proof of causation of damages was insufficient. We reject the latter argument without discussion other than to observe that, with respect to that argument, Carpenter asserts that our review is *de novo* and, from that faulty premise, she proceeds to make arguments that are inconsistent with our proper standard of review of a denial of a motion for a directed verdict. *See Hudjohn*, 200 Or App at 342 (evidence, including any inferences, is viewed in the light most favorable to the nonmoving party).

We turn to Carpenter's argument that the trial court erred in denying her motion for a directed verdict on the direct breach of fiduciary duty claim on the ground that that claim was derivative. The parties agree, as do we, that that issue is governed by Delaware law. We note that, in the pertinent Delaware cases, the issue was decided at the pleading stage, in the context of determining whether the plaintiffs had stated facts supporting a derivative action or a direct action. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A2d 1031, 1035 (Del 2004) (court "will independently examine the nature of the wrong alleged and any potential relief to make its own determination of the suit's classification"). Here, by contrast, Carpenter's challenge arose in the context of motions at trial to test the sufficiency of the evidence. In either circumstance, though, the inquiry requires an examination of the pleadings and the evidence in the light most favorable to the plaintiff. Thus, we turn to the pertinent facts alleged in the eighth amended complaint, as supported by the evidence presented at trial, and we view them in the light most favorable to Kollman.

This case involves numerous claims that are not at issue on appeal and a very lengthy record; rather than attempting to describe the whole of this complex litigation, we focus on the facts pertinent to the particular claim before

us.[7] The factual background of the parties' dispute was discussed in our opinion concerning the dissolution of Kollman and Carpenter's marriage. *Kollman and Kollman*, 195 Or App 108, 96 P3d 884 (2004). The primary issue in that case concerned whether the trial court had erred in treating the voting rights of Carpenter's shares in Cell Tech as a marital asset and awarding those rights to her in the dissolution. Because much of the evidence in the two cases overlaps, for convenience we set out the pertinent background facts from our decision on appeal in the dissolution case:

> "In 1982, husband and wife remarried and moved together to Klamath Falls with the idea that they would begin an algae business using algae from Klamath Lake. * * * [H]usband and wife, along with three businessmen, contributed money to form a blue green algae company called Cell Tech International Incorporated (Cell Tech). Husband designed and built an algae harvester and Cell Tech began harvesting, freeze-drying, and processing algae. Husband also worked with distributors. Wife ran the day-to-day aspects of the business—she answered the phone, took and packaged orders, and managed details.

> "At some point, Cell Tech began to struggle financially, and it was agreed that Cell Tech would be sold to businessman Neil Townsend. Soon afterward, however, husband and wife decided to buy Cell Tech back from Townsend and go into the algae business as partners. Before buying Cell Tech, on July 19, 1990, wife signed Exhibit 48, which provided that husband would control wife's voting rights in wife's shares of Cell Tech stock.

> "* * * * *

> "On August 1, 1990, husband and wife bought Cell Tech from Townsend. Husband served as general manager, chairman of the board, chief executive officer (CEO), secretary, and treasurer of the company. He designed the

---

[7] We note that, unlike many cases involving alleged breaches of fiduciary duties to shareholders, this case involved much evidence concerning reasons—other than the perhaps more common financial reasons—for the parties' actions toward one another, including evidence on matters such as marital infidelity and physical abuse involving not just Kollman and Carpenter but various others involved in the running of the corporation. Because the issues we ultimately address on appeal are narrow, we perceive no need to elaborate that evidence, but merely note its existence in order to provide relevant context.

harvest equipment and assisted with its construction. He also designed the techniques and the process for making algae products, and he produced the algae products. Wife served as president of Cell Tech and was heavily involved with harvesting and laboratory work. Wife continued to oversee the day-to-day details of Cell Tech, including taking orders, packaging, harvesting, freeze-drying, credit card processing, running the computer, and running payroll.

"\* \* \* \* \*

"In 1984, husband ceased filing taxes to protest government policies. His failure to pay taxes continued through 1996 and, at that point, he and wife owed approximately $100,000 in penalties and interest to the IRS. Ultimately, due to his failure to pay taxes, husband was convicted of a felony. Because of his conviction, husband decided that it would be too difficult to sell Cell Tech stock if he were on the board of directors or an officer of the company. Husband testified that he and wife agreed that, despite the fact that he could not be officially involved, they would continue to work together, running Cell Tech the same way that they had in the past. Husband also said that they agreed that he would continue to manage the board of directors and the company itself.

"At the time of trial, Cell Tech's sales were decreasing each year. In late 1995 and 1996, Cell Tech reached its financial peak when its gross sales reached $200 million dollars. In 2000, Cell Tech incurred a net loss of $2.8 million and, by the end of 2000, its liabilities exceeded its assets by $7.3 million.

"On August 6, 1999, a company called HumaScan entered into a 'reverse merger' with Cell Tech. Essentially, HumaScan bought Cell Tech and reissued the corporate stock as Cell Tech stock. The purpose of the reverse merger was to facilitate the public registration of Cell Tech stock so that husband and wife could sell their shares of publicly traded Cell Tech stock and satisfy their debt to the IRS.

"On November 10, 1999, Cell Tech sent husband a letter terminating his employment with Cell Tech. The letter stated that Cell Tech would like to employ husband as a part-time consultant but that he would no longer be an employee or officer of Cell Tech. At the time of trial, husband was unemployed and was not serving as a consultant for Cell Tech.

"Wife stayed on at Cell Tech as the president, CEO, principal executive officer, principal financial officer, and principal accounting officer. Wife is also on the board of directors. * * * Husband and wife also own approximately 80 percent of Cell Tech stock, which is divided equally between them."

*Kollman*, 195 Or App at 111-14.

To recap, Cell Tech initially was jointly owned and operated by Kollman and Carpenter, and Kollman had the ability to vote Carpenter's stock. After Kollman was convicted of a tax-related felony, he ceased to be an officer and a member of the board of directors of Cell Tech. The breach of fiduciary duty claim at issue here centers on the saga of what happened to the parties' stock in Cell Tech during and in the wake of the dissolution proceeding. As noted, Cell Tech's sales peaked in the mid-1990s, and they began to decline thereafter. In 1997, Cell Tech undertook a costly expansion of its facilities. During the mid-1990s, Cell Tech also failed to pay a number of tax obligations. Thus, by the late 1990s, Cell Tech was facing considerable financial pressure, and Carpenter and Kollman had significant individual tax obligations that remained unpaid. In order to address those financial problems, Carpenter and Hateley arranged for the HumaScan reverse-merger described above. They also took various steps to obtain interim financing, most of which fell through, and the interim financing that was obtained was not on terms that were favorable to Cell Tech. As noted, the goal of the HumaScan transaction was "to facilitate the public registration of Cell Tech stock so that [Kollman and Carpenter] could sell their shares of publicly traded Cell Tech stock and satisfy their debt to the IRS." *Id.* at 113.

In the present case, Kollman alleged—and there was evidence to the effect—that Carpenter and Hateley deceived him into giving up his positions as an officer and a director of Cell Tech by indicating that his prior felony conviction disqualified him from retaining those positions, and by falsely promising that he would continue to manage Cell Tech. Evidence showed that, after the HumaScan merger was completed, Kollman was excluded from all meaningful participation in the management of the business and that, although he continued to own 46.2 percent of the outstanding shares of

Cell Tech, his employment was terminated. Moreover, Carpenter's son was placed on the board of directors, and Carpenter's annual salary was increased from approximately $140,000 to $290,000.

In addition, without Kollman's knowledge, Carpenter and Hateley undertook to sell 10 percent—about one million shares—of Cell Tech's outstanding common stock to an investor, Kazi, at a share price that was approximately one fifth of its then-current value. Pursuant to the Kazi agreement, Kazi was entitled to acquire additional shares if the value of the company were to decrease. Further, if the company failed to complete its planned registration with the Securities Exchange Commission (SEC), Kazi would be entitled to acquire up to an additional eight million shares. Those events came to pass; the value of the company did decrease, and the company failed to complete its SEC registration. As a result, Kazi acquired a large amount of Cell Tech's outstanding common stock, and Kollman's percentage of ownership of the company was dramatically reduced.

The Kazi transaction formed the basis for Kollman's direct breach of fiduciary claim that is at issue on this appeal. Specifically, Kollman alleged and adduced evidence that Carpenter, as well as Hateley acting on Carpenter's behalf, breached her fiduciary duty to him as a shareholder by concealing the nature of the Kazi transaction and by failing to complete the SEC registration as required. As a consequence, according to Kollman's pleading and proof, the percentage of Kazi's shares increased, Kollman's percentage decreased, and Kollman was unable to publicly sell his shares, as originally planned, to meet his tax obligations. Kollman also alleged and adduced evidence from which an inference could be drawn that Carpenter breached her fiduciary duty to him by taking the steps described above to prevent him from participating in the management of the company.

Carpenter asserts that the subject claim for breach of fiduciary duty is a derivative claim, not a direct claim, because its premise is that her actions diluted the value of Kollman's stock in Cell Tech. *See Feldman v. Cutaia*, 951 A2d 727, 734 (Del 2008) ("equity dilution does not generally constitute a direct harm, but, instead, a derivative one").

Kollman replies that breaches of fiduciary duties such as the one at issue here are properly classified as direct. Moreover, Kollman notes that if the claim were treated as derivative rather than direct, Kazi, who ultimately obtained ownership of more than 90 percent of the shares of the corporation, would be the primary beneficiary of the recovery of damages from Carpenter, despite the fact that Kazi was the primary beneficiary of her wrongdoing in the first place.

As explained below, we conclude that the trial court correctly determined that the disputed claim was a direct claim.[8] In *Tooley*, the Delaware Supreme Court abandoned prior case law that had endorsed a "special injury" test to determine whether a claim was direct or derivative. That test required a determination whether the plaintiff had suffered an injury that was "separate and distinct from that suffered by other shareholders." *Tooley*, 845 A2d at 1035 (citing *Moran v. Household Int'l. Inc.*, 490 A2d 1059, 1070 (Del Ch 1985), *aff'd*, 500 A2d 1346 (Del 1986)). In *Tooley*, the court instead adopted the following test:

> "The analysis [to distinguish between direct and derivative actions] must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy."

*Tooley*, 845 A2d at 1035.[9] In discarding the "special injury" test, the court described one of its earlier cases in terms that particularly inform the question presented here:

---

[8] We note that some of the parties' arguments on appeal focus on the notion that Kollman "elected" to pursue certain claims as direct rather than as derivative claims. During trial, the trial court indicated that both direct and derivative claims could not go forward, and Kollman responded that, in that event, he would elect to pursue the claim at issue on appeal as a direct claim. The trial court proceeded to submit certain direct and derivative claims to the jury, and, in deciding motions for judgment notwithstanding the verdict, indicated that it was ruling as a matter of law that the claim at issue here was properly a direct claim, not a derivative claim. The Delaware cases discussed below indicate that whether a claim is direct or derivative is a question of law for the court. With respect to the narrow questions presented on appeal concerning the claim that ultimately was submitted to the jury and that formed the basis for the judgment at issue here, we conclude that the trial court correctly treated the issue as a question of law, and that the propriety of the "election" of this claim is not pertinent for present purposes.

[9] In describing the first prong of this test—who suffered the alleged harm—the *Tooley* court approved an earlier decision of the Delaware Chancery Court that had described the pertinent inquiry as follows: "Looking at the body of the complaint

"In *Lipton v. News International, Plc.*, [514 A2d 1075, 1078 (Del 1986)], this Court applied the 'special injury' test. There, a stockholder began acquiring shares in the defendant corporation presumably to gain control of the corporation. In response, the defendant corporation agreed to an exchange of its shares with a friendly buyer. Due to the exchange and a supermajority voting requirement on certain stockholder actions, the management of the defendant corporation acquired a veto power over any change in management. The Lipton Court concluded that the critical issue in distinguishing direct and derivate actions is whether a 'special injury' has been alleged. There, the Court found a 'special injury' because the board's manipulation worked an injury upon the plaintiff-stockholder unlike the injury suffered by other stockholders. That was because the plaintiff-stockholder was actively seeking to gain control of the defendant corporation. Therefore, the Court found that the claim was direct. *Ironically, the Court could have reached the same correct result by simply concluding that the manipulation directly and individually harmed the stockholders, without injuring the corporation.*"

*Id.* at 1037-38 (emphasis added; footnotes omitted).

Here, too, viewing the evidence and the inferences that may be drawn from it in the light most favorable to Kollman, Carpenter's actions were intended to—and did—harm Kollman individually, not merely as a stockholder, but also as a participant in the affairs of the corporation. Although it is true, as Carpenter observes, that the effect of the Kazi transaction was to dilute the value of her own shares in the same manner that the value of Kollman's shares was diluted, the Kazi transaction and Carpenter's related actions did not cause the same harm to Carpenter that they caused to Kollman. To the contrary, whereas Kollman's interest in, and control over, the corporation were essentially nullified and his employment was terminated, Carpenter gained control of the corporation, and she received considerable remuneration for her employment. As noted, the vast majority of the shares in Cell Tech were held by

---

and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?" 845 A2d at 1036 (quoting *Agostino v. Hicks*, 845 A2d 1110, 1122 (Del Ch 2004)).

Kollman and Carpenter, and later Kazi. In that circumstance, where Carpenter was the party against whom the claim was asserted, it defies reason to suggest that Kollman was one of a class of shareholders similarly affected by the wrongdoing—he was, in fact, the *only* shareholder affected by the wrongdoing in the noted respects.

Carpenter remonstrates that, although equity dilution claims alleging that a controlling shareholder has increased his or her ownership and decreased that of the minority shareholder, are cognizable as direct claims, the situation here is distinguishable because her own shares were reduced in step with Kollman's shares. That is, although her actions allowed her to gain control over the corporation and gain financial advantage, those consequences resulted from means *other than* increasing her ownership in the stock of the corporation. Therefore, she asserts, the subject claim is a standard "equity dilution" claim and necessarily must be treated as a derivative claim. *See Feldman*, 951 A2d at 734 (so holding).

Following its decision in *Tooley*, the Delaware court has decided several cases that inform our analysis. In *Gentile v. Rosette*, 906 A2d 91, 94-95 (Del 2006) (*Rosette*), a group of minority shareholders brought a direct action for breach of fiduciary duty against the chief executive officer and controlling stockholder of SinglePoint, based on a transaction in which the defendant had forgiven the corporation's debt to him in exchange for stock whose value exceeded the value of the debt. That transaction increased the defendant's ownership in the corporation from approximately 60 percent to more than 90 percent. Thereafter, the defendant negotiated a merger that caused SinglePoint to become a wholly owned subsidiary of another company, Confiniti. As a condition of the merger, the defendant secured a promise from Confiniti that it would repurchase from the defendant (but not from the other Singlepoint shareholders) shares that he received as a result of the merger. *Id.* at 95.

The trial court had granted summary judgment for the defendant on the ground that the claim was exclusively derivative. On appeal, the court disagreed. Citing *Tooley*, the court held that the dispositive questions were who suffered

the alleged harm and who would receive the benefit of any recovery. In particular, the plaintiffs relied on *In re Tri-Star Pictures, Inc.*, 634 A2d 319 (Del 1993), arguing that, under the analysis of that case, the defendant's self-dealing increased his voting power and the economic value of his interest in Singlepoint "at the expense and to the corresponding detriment of the minority shareholders." *Rosette*, 906 A2d at 99. The court ultimately agreed. It noted that, in general, the overpayment of its debts causes harm to a corporation and that "[s]uch claims are not normally regarded as direct, because any dilution in the value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity." *Id.* An exception exists, though, where

> "(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders."

*Id.* at 100 (citations omitted). The court held that "this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder," and thus can be pursued as a direct claim. *Id.* In particular, the court indicated that, in the instant circumstance, the minority shareholders had suffered a harm that was unique to them and independent of the harm to the corporation: "The harm to the minority shareholder plaintiffs resulted from a breach of a fiduciary duty owed to them by the controlling shareholder, namely, not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority stockholders." *Rosette*, 906 A2d at 104.

Carpenter asserts that *Rosette* supports her position that no direct claim was cognizable under the circumstances of this case, noting that, although it diluted the value of Kollman's shares in the corporation, her challenged conduct did *not* actually increase the value or percentage of Carpenter's own shares, and thus the exception described in *Rosette* and

*Tri-Star* does not apply. Kollman responds that, in *Gatz v. Ponsoldt*, 925 A2d 1265 (Del 2007), the court made it clear that the exception at issue can apply to circumstances like those in the present case.

In *Gatz*, the series of transactions that gave rise to breach of fiduciary duty claims resulted in a defendant, Ponsoldt, acquiring a "sizeable minority block of Regency shares, that gave him de facto control of that company." *Id.* at 1268. The details of the transactions were complex, but the court summarized them as follows:

> "[A]n intricate transaction [was] negotiated by Ponsoldt and Lawrence Levy ('Levy'), and carried out without approval by Regency's public shareholders, that enabled Ponsoldt to cash out most of his equity interest in Regency and to convert his de facto stock control of Regency into an absolute majority interest that simultaneously was transferred to an entity owned by Levy. The end result was that Regency's public shareholders—who previously had held Regency's majority stock interest—became minority shareholders in a Levy-controlled enterprise."

*Id.* The court explained the effects of the transactions as follows:

> "First, Levy (through Royalty) provided $4.75 million cash to Regency to finance the transaction, in return for which Levy/Royalty ended up with the $1.25 million Regency note, plus 59.31% majority stock control of Regency * * * and control of Regency's board.

> "Second, Ponsoldt (through Statesman) received $4 million of the $4.75 million cash provided by Levy-Royalty. In addition, Ponsoldt/Statemsman's preexisting obligation to pay Royalty $2.44 million (the exercise price for Statesman's option to acquire 6.1 million pre-split Regency shares) was canceled. Thus, it appears from the complaint that Statesman ended up holding 6.1 million Regency shares (pre-split) for no consideration, which shares Statesman then sold back to Regency (post-split) for $1.02 million.

> "Third, Regency, now controlled by Levy (Royalty) ended up with $500,000 of the $4.75 million provided by Levy, after playing $250,000 in recapitalization expenses.

"Fourth, Regency's public shareholders received no financial or other economic benefit from the recapitalization. Moreover, their combined stock ownership was diminished from a majority interest of approximately 62% to a combined minority interest of about 40%."

*Id.* at 1271. The court distilled the following principles from *Tri-Star* and *Rosette*:

"Those cases hold that where a significant or controlling stockholder causes the corporation to engage in a transaction wherein shares having more value than what the corporation received in exchange are issued to the controller, thereby increasing the controller's percentage of stock ownership at the public shareholders' expense, a separate and distinct harm results to the public shareholders, apart from any harm caused to the corporation, from which the public shareholders may seek relief in a direct action."

*Id.* at 1274.

The court then considered whether the transactions at issue in *Gatz* were meaningfully different, given that the series of transactions did not increase either the voting power or the economic value of the shares held by Ponsoldt. The court held that it could be inferred that the effect of the transactions was to dilute the stock interests of the public shareholders, to provide Ponsoldt the means to cash out his stock interest, and to allow Levy to obtain majority control over the corporation. *Id.* at 1276. The court noted:

"There is one significant factual difference between this case and the facts alleged in *Tri-Star* and *Rosette*: Here, to the extent that the recapitalization resulted in a dilution or expropriation of value and voting power of the shares held by the Regency public stockholders, that expropriation did not redound directly (and correspondingly) to the benefit of Regency's controlling stockholder, Statesman/Ponsoldt. Rather, the direct beneficiary of any alleged expropriation of that voting power and economic value was a third party, Royalty/Levy, which owned no Regency stock before the recapitalization."

*Id.* at 1278-79. However, after examining the timing of and motivations for the series of events, the court concluded that to distinguish the circumstances in *Gatz* from the circumstances in *Tri-Star* and *Rosette* "would unjustly exalt form

over substance in circumstances where the identical policy concerns that underlie *Tri-Star* and *Rosette* exist here." *Id.* at 1280. The court ultimately concluded that, although the trial court had correctly determined that the claim could be brought derivatively, it also stated a direct claim. *Id.* at 1281.

Here, it is undisputed that the transactions did not have the same effect as those at issue in *Tri-Star* and *Rosette*. That is, Carpenter did not use these transactions to increase her percentage of stock ownership at the other shareholders' expense. Thus, the dispositive question is whether the circumstances here are sufficiently similar to those in *Gatz*: Carpenter asserts that *Gatz* is distinguishable because "the controlling shareholder there transferred his stock to a third party—*in exchange for cash*—while simultaneously authorizing a transaction designed to expropriate value from the minority shareholders." (Emphasis in original.) Certainly, there are some factual distinctions between this case and *Gatz*. In particular, as Carpenter points out, the defendant Ponsoldt in *Gatz* ended up with a large amount of money, the third-party, Levy, ended up with control of the corporation, and the minority shareholders ended up with neither. Here, by contrast, a third party, Kazi, ended up with control of the corporation, while both Carpenter's and Kollman's shares were diluted. Were those the only pertinent facts, we might agree with Carpenter that this claim more closely resembles a derivative claim than a direct claim. However, numerous other factors are in play here. As examples, (1) Carpenter secured Kollman's removal from his positions as an officer and a director based on false assertions and promises; (2) doing so allowed Carpenter to enter into the Kazi agreement without Kollman's knowledge; and (3) Carpenter ultimately controlled the corporation, increased her own salary dramatically, and terminated Kollman's employment. Although Carpenter's actions had essentially the same negative impact on the value of her own shares as they did on Kollman's shares, Carpenter's breach of fiduciary duty furthered her short-term goal of controlling the corporation and eliminating Kollman's role as an officer, director, and employee. In sum, viewing the evidence in the light most favorable to the nonmoving party, the series of events culminating in the breach of fiduciary duty here were not intended

to—and did not—equally harm all shareholders. Rather, that breach advanced Carpenter's goal of eliminating Kollman's participation in every aspect of corporate management and affairs.

Thus, we return to the basic inquiries: Who suffered the alleged harm? And who would receive the benefit of the recovery? *Tooley*, 845 A2d at 1035. Kollman suffered a unique harm, because he ceased to have the ability to meaningfully participate in corporate affairs. As for the benefit of the recovery, were Carpenter correct that this action should be treated as derivative rather than direct, the lion's share of any recovery would go to Cell Tech, ultimately to the benefit of Kazi, who already has benefitted from the breach of fiduciary duty. Because our focus is on the nature of the harm, and because we decline to elevate form over substance in applying that test, we conclude that the trial court properly denied Carpenter's motion for a directed verdict on Kollman's direct claim for breach of fiduciary duty.

We turn, briefly and finally, to the arguments that Cell Tech's Special Litigation Committee advances on its cross-appeal. As noted, the Committee asserts that the trial court erred when, after various claims (both direct and derivative) had been submitted to the jury and the jury had returned verdicts in Kollman's favor, it entered judgment for Kollman on the direct claim at issue on appeal. As we have concluded, however, the trial court correctly permitted Kollman to pursue the direct claim against Carpenter. As for the Committee's corollary argument on cross-appeal that, rather than enter a judgment for Kollman on the direct claim, the court should have entered judgment in favor of Cell Tech on behalf of its shareholders on one of the derivative claims, that argument is unpreserved, and, in any event, inconsistent with our conclusion set forth above.[10]

In sum, we conclude that the trial court properly entered judgment for plaintiff Kollman on his direct claim for breach of fiduciary duty.

---

[10] No party argued in the trial court, and the Special Litigation Committee does not argue on appeal, that the court could or should have entered judgment on both direct *and* derivative claims.

On Cell Tech's appeal, dismissed for lack of a justiciable controversy; on Kollman's cross-appeal, affirmed; on Carpenter's appeal, affirmed; on Special Litigation Committee's cross-appeal, affirmed.